Melvin **FREEMAN**, for himself, and for all others similarly situated

v.

**MOTOR CONVOY, INC.,** et al.

**Douglas Spencer (Intervenor).**

**Civ. A. No. 16185.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 10, 1975.

As Amended Feb. 10, 1976.

John R. Myer, Howard Moore, Jr., Elizabeth R. Rindskopf, George L. Howell, Joseph Ray Terry, Jr., Atlanta, Ga., Jack Greenberg, William L. Robinson, Morris J. Baller, New York City, Roger L. Goldman, St. Louis, Mo., for plaintiff.

Robert L. Mitchell, Wilson, Wilcox & Wilson, Atlanta, Ga., Roland P. Wilder, Jr., Washington, D. C., for defendants.

RICHARD C. FREEMAN, District Judge.

## ORDER

This is a class action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (hereinafter Title VII) and the Civil Rights Act of 1866, 42 U.S.C. § 1981, to recover for racial discrimination in employment. Defendant Motor Convoy, Inc. (hereinafter the Company) is an interstate motor carrier of motor vehicles with its main office in Atlanta, Georgia. Defendant Company is a party to the "National Master Automobile Transporters Agreement" and the "Central and Southern Areas Supplemental Agreements" with defendant Teamsters Local Union No. 528 (hereinafter the Local), which is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter the International). Plaintiff Freeman is an employee of the defendant Company presently employed in the shop of defendant's Atlanta facility. Intervenor Spencer is employed as an "over-the-road" driver; however, he is presently in layoff status. A class has been certified in this action, consisting of "all black employees of Motor Convoy, Inc., excluding office and supervisory personnel, who are employed, or who were employed and have been discharged or laid off since July 2, 1965, within the Southern Conference of Teamsters." *See Freeman v. Motor Convoy, Inc.* (N.D.Ga. 1974), 68 F.R.D. 196, 19 F.R.Serv.2d 650, *reconsideration denied,* 68 F.R.D. 204 (Jan. 9, 1975).

This action was tried before the court on March 11–13, 1975, at which time the parties introduced testimonial and documentary evidence, as well as stipulations, concerning the merits of this case. In fact, it is clear, based on the stipulation of the parties submitted on commencement of the trial, that plaintiffs have established a prima facie case of discrimination in employment. *See, e. g., United States v. T.I.M.E.–D.C., Inc.,* 517 F.2d 299 (5th Cir. 1975); *Sabala v. Western Gillette, Inc.,* 516 F.2d 1251 (5th Cir. 1975); *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40 (5th Cir. 1974).

## THE PRIMA FACIE CASE

The stipulation of the parties and the other evidence before the court shows that from 1965 through 1974 the defendant company hired some 142 persons of the white race as over-the-road drivers in the Atlanta facility and only 5 blacks. Moreover, all of the blacks hired as over-the-road drivers were hired since 1971 and two of these black drivers hired were laid off within one month of their hiring date. During this period, the total number of persons employed as drivers at the Atlanta terminal ranged from 214 to 140, whereas the company employed no more than 1 to 3 black drivers during this same period. Thus Blacks, historically, and at present, constitute a very small portion of the driver work

force at the Atlanta terminal. Statistics for the other terminals in the Southern Conference area are similar.

The instant proceeding does not solely relate to road driving jobs, however, and the parties have also introduced statistical evidence regarding the racial composition of the defendant Company's shop and yard divisions.[1] Employees in these divisions did not become members of the defendant Local until 1969. The yard employees were formally organized after the shop employees, but, the formal unionization date was set as October 13, 1969 for both groups. Before this date, the defendant Company did not maintain a seniority system for yard and shop employees, nor did the Company maintain formal job classifications for these employees. Prior to unionization, the yard and shop employees were informally characterized as mechanics, helpers, tire men, greasers, gasers, and porters. Persons informally classified as mechanics received the highest rate of pay among the yard and shop employees. Following unionization, the shop employees were divided into the following classifications: welder-mechanic; mechanic; advanced apprentice mechanic; helper, greaser, and tireman; janitor, porter, and washer. The "helper, grease, and tireman" classification has now been changed to an "apprentice mechanic" classification. The stipulation of the parties shows that following unionization, ten black shop employees were classified as either helpers or porters whereas only two white employees were in this classification. On the other hand, only one black employee, plaintiff Freeman, was classified as a mechanic, whereas 19 white employees were either welder-mchanics or mechanics. As of the time of trial, these statistics had not changed significantly.

In sum, as of the time of trial, the defendant Company maintained job classifications relevant to this action consisting of over-the-road drivers; welder-mechanics; mechanics; advanced apprentice mechanics; apprentice mechanics; and porters. Persons employed as over-the-road drivers, welder-mechanics and mechanics received the highest rates of pay. The relevant statistics show that at all times pertinent to this action, these higher paying, more desirable jobs, were virtually all-white jobs. These statistics establish a prima facie case of past discrimination in hiring and job assignment. *See Rodriguez v. East Texas Motor Freight, supra,* at 53–55. Moreover, this statistical evidence of discrimination is corroborated by the testimony of plaintiff's witnesses. This testimony related to several incidents of purported discriminatory hiring, training, and general treatment by Company officials and employees. Although the Company denies any discriminatory motive and introduced conflicting testimony regarding the purportedly discriminatory incidents, problems of conflicting testimony do not constitute a critical factor in this case. In class action employment discrimination cases, it is well settled that each member of a class need not show individualized discrimination where overwhelming statistical evidence shows a continuing pattern or practice of discrimination with respect to the class as a whole. The question in such cases is not whether plaintiffs have shown specific acts of overt or covert discrimination, but whether the defendants have adduced sufficient contrary evidence to rebut plaintiffs' prima facie case. *E. g., id.* Furthermore, where statistical evidence shows a long standing practice of relegating blacks to lower paying, less desirable jobs, and excluding blacks from certain job classifications, the fact that past discriminatory policies may have been eliminated does not constitute a viable defense:

[R]ecent minority hiring progress stands as a laudable good faith effort

1. Plaintiffs have not sought to represent shop and yard employees on a system wide basis, perhaps because the largest yard and shop departments are located at the Company's Atlanta terminal. In any event, the statistical and testimonial evidence concerning yard and shop employment practices relates solely to activity at the Atlanta terminal.

to eradicate the effects of past discrimination in the area of hiring and initial assignment. But it is not enough to eradicate the effects of the past discrimination against incumbent minority group members who are presently locked into the position to which they were initially and discriminatorily assigned. *United States v. T.I.M.E.–D.C., Inc.,* supra at 316. The "lock-in" effect results from no transfer rules and seniority rules incorporated in collective bargaining agreements commonly utilized in the trucking industry. The courts have uniformly ruled that when these seniority provisions effectively discourage or preclude transfer from the less desirable, lower paying job, into the more desirable, higher paying jobs, they perpetuate past discrimination and must be modified by affirmative judicial action. In such cases, both the employer and the union are jointly liable for the discriminatory effects of past as well as present employment practices, unless the defendants can show that the present seniority policy is justified by a "business necessity." *E. g., Rodriguez v. East Texas Motor Freight, supra; Bing v. Roadway Express, Inc.,* 444 F.2d 687 (5th Cir. 1971). *See also, Sagers v. Yellow Freight System, Inc.,* 58 F.R.D. 54, 6 E.P.D. ¶ 8885 (N.D.Ga.1973). Before turning to the question of whether or not defendants have shown an adequate business necessity for continuing their seniority policy, this court must resolve certain critical issues relating to the liability of the defendant International and the proper parameters of the class in this action.

## LIABILITY OF THE INTERNATIONAL

### A. Jurisdiction

■ In its post trial brief, the defendant International contends that plaintiffs have not carried their burden of proof with respect to questions of *in personam* jurisdiction. Defendant International contends that service was insufficient and also that jurisdiction is improper under constitutional concepts. In a prior order this court concluded that there was a sufficient showing of "threshold" jurisdiction under the Georgia Long Arm Statute, Ga.Code Ann. 24–113.1, to withstand a motion to dismiss. *Freedom v. Motor Convoy, Inc.,* 9 F.E.P. 85 (N.D.Ga. 1972). More recently, however, in an order entered on June 30, 1975, this court noted that it had entered a ruling in a similar case which had the effect of overruling in part a portion of the 1972 order entered in the instant proceeding. *See Sinyard v. Foote & Davies,* 9 E.P.D. ¶ 10,160 at 7714–15 (N.D.Ga.1975). In *Sinyard* this court held that service of an International union effected by serving an agent or official of one of its locals, was permissible under Ga.Code Ann. § 3–119 and was sufficient to perfect service pursuant to Rule 4, Fed.R.Civ.P. In the instant proceeding service was also perfected by serving an official of the defendant local; therefore, it is not necessary to consider the parties' arguments with respect to service under Ga. Code Ann. § 24–113.1: "[L]ong Arm Statutes which provide for extraterritorial service, need not be employed if an available state statute provides for a viable alternative." *Sinyard v. Foote & Davis, supra,* at 7715.

■ Questions regarding whether the assertion of personal jurisdiction over the defendant International is constitutionally permissible are somewhat more complex. In the first instance, it should be noted that "[t]here is no objective test by which to judge the facts of a particular case to determine if the assertion of *in personam* jurisdiction exceeds the limits of constitutional due process." *Benjamin v. Western Boat Building Corp.,* 472 F.2d 723, 725 (5th Cir.) *cert. denied,* 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973). The defendant International argues that plaintiffs have not carried their burden of proof with respect to in personam jurisdiction since they have not shown "by a preponderance of the evidence that defendant International Union transacted business within Georgia and the cause of action sounding in

contract arose out of the business conducted therein." This argument is obviously based in part upon a misconception regarding this court's 1972 order. In that order, the court noted that a Title VII action may not be clearly characterized as founded in either tort or contract, although it has elements of both. 9 F.E.P. at 86. Nevertheless, in the 1972 order, the court predicated its conclusion with respect to "threshold" jurisdiction upon the contract provisions of the Georgia Long-Arm Statute. This ruling was necessary because, at that time, the Georgia courts had concluded that subsection (c) of the statute, Georgia Code Ann. § 24–113.1(c),[2] should not be retroactively applied. 9 F.E.P. at 86 n. 2. More recently, the Georgia courts have adopted the Illinois rule with respect to long arm jurisdiction over a nonresident's tortious acts. *E. g., Coe & Payne v. Wood-Mosaic Corp.,* 230 Ga. 58, 195 S.E.2d 399 (1973). *See Thorington v. Cash,* 494 F.2d 582 (5th Cir. 1974). Under recent interpretations regarding the assertion of extraterritorial jurisdiction, the courts have uniformly ruled that subsection (b) of the Long Arm Statute is coterminus with the due process clause. *Thornton v. Toyota Motor Sales, USA, Inc.,* 397 F.Supp. 476 (N.D.Ga. 1975); *Stanley v. Local 926 of the International Union of Operating Engineers of the AFL–CIO,* 354 F.Supp. 1267, 1271 (N.D.Ga.1973). *See Coe & Payne v. Wood-Mosaic Corp., supra.*[3] In that regard, the courts have also ruled that "the commission of a single act might in certain circumstances justify the assertion of jurisdiction by a state over a non-resident defendant." *Rebozo v. Washington Post Co.,* 515 F.2d 1208, 1214 (5th Cir. 1975).

In many cases, it appears that the courts often equate the question of personal jurisdiction with the underlying question of substantive liability. Thus, in the tort context, if the non-resident defendant causes injury within the state by his conduct without the state he is both subject to jurisdiction and liability based on this activity. *E. g., Rebozo v. Washington Post Co., supra; Edwards v. The Associated Press,* 512 F.2d 258 (5th Cir. 1975). It naturally follows that if the defendant's activity was not tortious, or if this activity had no impact within the state, the defendant may not be subject to jurisdiction and would not be held substantively liable. Conversely, a defendant's jurisdictional defense may fail; and yet, the defendant may prevail on the merits of the action. *See Sinyard v. Foote & Davies, supra.*

■ In the instant case, defendant International argues that it is "incumbent on plaintiffs to prove a substantial connection between International Union and allegedly discriminatory provisions in the supplemental Car-Haul Agreements." This is certainly true with respect to the merits of the suit, and this court also agrees that if such a "substantial connection" may be shown on the merits, this connection is also sufficient to uphold a finding of in personam jurisdiction. In the instant case, this court has concluded that the defendant International should be liable for the discriminatory provisions in the collective bargaining agreements in issue here; therefore, it is not necessary to inquire with respect to the issue of whether or not defendant may or may not have otherwise fulfilled certain objective criteria for the

---

**2.** Subsection (c) of the Long Arm Statute provides that the Georgia courts may assert extraterritorial jurisdiction over a nonresident who

[c]ommits a tortious injury in this State caused by an act or omission outside this State, if the tortfeasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State . . . .

**3.** Liberal construction of the "tortious act" section of the Long Arm Statute and adoption of the Illinois rule has resulted in a broader exercise of extraterritorial jurisdiction than would arguably be permissible under the plain language of subsection (c) of the statute. As a result, the courts have concluded that subsection (c) is actually superfluous. *E. g., Thornton v. Toyota Motor Sales, U.S.A., Inc., supra.*

determination of personal jurisdiction.[4] Thus, whether the single tortious act approved in *Rebozo v. Washington Post Co., supra,* is used; or whether this court considers the defendant International's deliberate, purposeful contacts with this forum, *see Product Promotions, Inc. v. Cousteau,* 495 F.2d 483 (5th Cir. 1974); *Stanley v. Local 926 of the International Union of Operating Engineers of the AFL–CIO, supra,* this court has concluded that the "maintenance of [this] suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *Product Promotions, Inc. v. Cousteau, supra.*

### B. Substantive Liability

Turning to the question of the International Union's substantive liability for the discriminatory seniority provisions contained in the collective bargaining agreements in issue, this court is in receipt of an application from the E.E.O.C. for leave to file an amicus curiae brief. The defendant International objects to this request on the grounds that the arguments asserted in the amicus brief contravene the official position of the E.E.O.C. to the effect that International Unions should be presumptively liable for violations of Title VII involving their affiliated locals. The presumptive approach to International Union liability adopted in some jurisdictions, *see Myers v. Gilman Paper Corp.,* 392 F.Supp. 413, (S.D.Ga.1975), has been specifically rejected by this court in *Sinyard v. Foote & Davies, supra.* Nevertheless, the fact that the E.E.O.C. may disagree with the court with respect to this issue is not a sufficient reason to deny the E.E.O.C.'s motion for leave to file an amicus brief.

Accordingly, the motion is hereby granted.

In *Sinyard,* the court specifically ruled that "in the absence of either direct or indirect participation in the negotiation or execution of the bargaining agreements, the International may not be held liable for violation of Title VII as a result of their contents. *Herrera v. Yellow Freight System, Inc.,* 505 F.2d 66 (5th Cir. 1974); *Resendis v. Lee Way Motor Freight, Inc.,* 505 F.2d 69 (5th Cir. 1974)." *Id.* at 7718. In light of this ruling and in light of the evidence, the defendant International argues that it should not be held liable for the discriminatory seniority provisions negotiated by Local Union officials and administered by the Local Union. Pursuant to the order of this court entered on June 30, 1975, the parties have filed supplemental briefs on this issue. The need for such briefs was deemed necessary in light of the absence of a substantive discussion in either the *Herrera* or *Resendis* cases concerning the basis for those courts' rulings. For instance, in *Herrera,* the court simply ruled that "[b]ecause the separate seniority lists originate at the Southern Conference level, we find no violation of Title VII by the defendant Teamsters International." *Id.* at 68 n. 2. The parties have argued in some detail concerning distinctions between freight industry cases, such as ·*Resendis* and *Herrera,* and car-haul industry cases such as the instant proceeding. Moreover, the E.E.O.C. has noted that it filed a petition for rehearing in those cases based largely upon the fact that the union constitutions were not in the record of those actions. Notwithstanding the fact that petitions for rehearing have been denied in *Resendis* and *Herrera,* 518 F.2d 1407, (5th Cir. 1975), the question before this court does not concern the sufficiency of the evidence in those

---

4. Plaintiffs, in their brief on the jurisdictional issue, argue that the court should adopt a "fairness" test in determining jurisdiction in a federal question case, rather than the arguably more restrictive "minimum contacts" test applied in diversity litigation. On the other hand, plaintiffs also stress the contacts of the International with this forum resulting from broad supervisory authority over the daily affairs of the Local granted by the Union Constitution. This court agrees that certain elements in both approaches provide a viable basis for the assertion of in personam jurisdiction over the International.

cases, but rather the sufficiency of the evidence in the instant proceeding. On review of this evidence, this court has concluded that the defendant International must be deemed equally liable for the discriminatory seniority provisions in issue here.

██ There are few cases containing detailed discussions regarding the liability of International Unions for discriminatory collective bargaining agreements affecting their locals. Most courts finding union liability have predicated their conclusion upon the obligation of the International Union to protect its minority members from discrimination and alternatively upon the Union's obligation to effectively eliminate past discrimination. The recent trend of authority also supports the proposition that an International Union's acquiescence in a discriminatory seniority system may be sufficient to justify the imposition of liability:

[A] union [must] assert the rights of its minority members in collective bargaining sessions, and not passively accept practices which discriminate against them.· *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 989 ([D.C.Cir.] 1973). Acquiescence in a departmental seniority system which produces unequal treatment on the basis of race is sufficient to subject the union to liability under Title VII. *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1381 (5th Cir. 1974).

*E.E.O.C. v. Detroit Edison Co.*, 515 F.2d 301, 314 (6th Cir. 1975). *See Myers v. Gilman Paper Corp., supra; United States v. Lee Way Motor Freight, Inc.*, 7 E.P.D. ¶ 9066 (W.D.Okl.1973). On the other hand, in *Sinyard v. Foote & Davies, supra*, this court concluded that the mere fact that an International Union was the titular head of the bargaining group represented by an affiliated local, in and of itself, is not sufficient to warrant a finding that the International should be held liable under Title VII. In that case, there was simply no evidence that the International had participated in the negotiations leading up to execu-

tion of the collective bargaining agreements in issue, nor was there any evidence that the International had acquiesced in those agreements. In fact, in *Sinyard*, the evidence before the court showed that the International had actually disapproved of the collective bargaining agreements and refused to execute those agreements, albeit not because of the discriminatory nature of the seniority provisions in those agreements. *See id.* at 7717. Moreover, the opinion of this court in *Sinyard* was based in part on the unexplained result in *Herrera* and *Resendis*. More recently, the United States Court of Appeals for the Fifth Circuit has clarified somewhat its approach to International Union liability in this area. *See United States v. T.I.M. E.–D.C., Inc., supra; Sabala v. Western Gillette, Inc., supra.* These recent cases have reaffirmed this court's conclusion that,

as a general proposition International Labor Unions should bear a heavy responsibility for the effective implementation of the remedial provisions of Title VII. Certainly, *where collective bargaining agreements are negotiated and implemented under the indirect, and at least the implicit, authority of the International*, it seems somewhat inconsistent with the general purposes of Title VII to excuse an International Union from liability for its nonfeasance, if not explicit misfeasance, with respect to discriminatory provisions incorporated in the agreement.

*Sinyard v. Foote & Davies, supra*, at 7717. (emphasis added).

The collective bargaining procedure giving rise to generally uniform trucking industry seniority systems has been discussed in some detail in *Rodriguez v. East Texas Motor Freight, supra*, and *United States v. T.I.M.E.–D.C., Inc., supra.* Although there are distinctions between the freight industry agreements in issue in those two cases and the carhaul industry agreements in issue in this case, the basic negotiating activity and practice appears to be quite similar. In

addition, the nationwide Constitution of the International Union is identical with respect to both industries. Under this Constitution, a charter may be issued to a local union only upon approval of the officers of the International. Article VII, Section 3, of the Constitution adopted by the Miami Beach, Florida, convention in July, 1971 (hereinafter the Constitution). Under the Constitution the International has the authority to exercise virtual control over the day-to-day affairs of its local affiliates, including all powers with respect to union membership, see Art. II, Sec. 2(b); the power to audit the local union's financial statements, Art. VII, Sec. 7; and the power to appoint a trustee for a local union whenever the local union affairs are not "being conducted in accordance with the Constitution and the laws of the International Union or for the benefit of the membership, or [are] being conducted in such a manner as to jeopardize the interests of the International Union. . ." Art. VI, Sec. 5(a), at p. 33. These are only a few of the provisions of the Union Constitution which afford the International substantial control over the affairs of the locals. Of course, potential control, in and of itself, may not be the sine qua non of liability for violations of Title VII. *See Herrera v. Yellow Freight System, Inc., supra,* at 68 n.2, *Resendis v. Lee Way Motor Freight, Inc., supra,* at 71 n.2. The ultimate question is whether the defendant International may be held liable for the discriminatory seniority provisions incorporated in the collective bargaining agreements in issue. In this regard, some consideration should be given to the actual process of negotiating those agreements.

Defendant's witness, the former president of Local 528, testified at some length concerning the negotiation of the collective bargaining agreements in issue here. The first agreement, negotiated in 1970, was effective for the period June 1, 1970 through August 31, 1973. The second agreement, negotiated in 1973, became effective immediately on the expiration of the former agreement and expires on May 31, 1976. These agreements consist of a "National Master Automobile Transporters' Agreement" and "Central and Southern Conference Areas Supplemental Agreements." The agreements are negotiated by a National Committee consisting of Mr. Frank E. Fitzsimmons, President of the International, and Walter J. Shea, an employee of the International, together with eight other members who are representatives of the various conferences. The Supplemental Agreement Negotiating Committee consists of various representatives of the local unions within the conference area; however, Mr. Fitzsimmons is listed as Chairman of the Supplemental Agreement Committee. Defendant's witness testified that Mr. Fitzsimmons attended only one of the negotiating meetings in 1970 and attended no meeting with respect to the 1973 agreements and moreover played no discernible role in the negotiation of these agreements. Under the International's Constitution, the two agreements become effective when they are ratified by a vote by the majority of the union members. Art. XVI, Sec. 4(a).

Defendants' witnesses also testified that the seniority provisions in the national and supplemental collective bargaining agreements need not necessarily control the seniority at an individual terminal, since these agreements contain provisions for the negotiation for local "riders." In fact, defendants' witnesses testified that a supplemental rider was negotiated in behalf of the employees of Complete Auto Transit Co.,[5] which provides for carryover seniority between the shop and the road driving divisions. One of the witnesses also testified that the question of providing carryover seniority by means of a similar rider was presented to the employees of the defendant Company; however, he stated that the

---

**5.** Complete Auto Transit Co. is also a trucking company engaged in the car-haul industry and maintains a terminal in the Atlantic area. The

employees of Complete Auto Transit Co. are also members of the defendant Local.

shop employees[6] voted against such a seniority system in light of the fact that carryover seniority would permit the more senior road drivers to bump into a shop job whenever the road drivers were temporarily laid off. This potential for cross bumping between divisions may be a critical factor in the car haul industry, where the business is unusually seasonal, with the concomitant requirement for periodic layoffs and hiring. On the other hand, the testimony concerning this vote is in dispute; for plaintiffs' witnesses testified that they did not recall such a vote involving carryover seniority and transfer between the shop and road driving divisions. Plaintiffs' witnesses testified that the only discussions they recalled regarding carryover seniority involved transfer between the shop division and the yard; and they stated that carryover seniority between the yard and shop was defeated by a vote of the yard employees. Such a vote would be consistent with the general policy of the defendant Local of allowing the smaller bargaining unit to effectively control the issue.

This court has concluded that any conflict in testimony regarding voting on "riders" need not be resolved; for on review of the relevant cases, it is evident that the potential desire of the local bargaining unit for transfer seniority or no-transfer seniority is irrelevant to the ultimate question of International Union liability. *E.g., Sabala v. Western Gillette, Inc., supra; Rodriguez v. East Texas Motor Freight, supra.* In *Rodriguez,* as apparently in the instant case, the union members voted against a proposal that the city and road driver divisions in issue there be merged. Although that proposition was rejected by a majority of the class certified in that action, the court noted that the overall class was comprised of members who had voted neither for nor against the carryover seniority proposition. As a result, the court concluded that "[t]he extent to which the vote represents the actual preference of the class, therefore, is unclear." *Id.* at 51. As a result, the court concluded that this possibly antagonistic vote of certain class members did not preclude certification of the action as a class action. *Id.* Moreover, the court specifically concluded that this vote did not constitute a defense to union inaction with respect to the discriminatory seniority provisions in issue, noting that "the unions perceive their responsibility too narrowly." *Id.* at 61. Similar arguments were raised by the union defendants in *Sabala v. Western Gillette, Inc., supra,* and these arguments were likewise rejected: "Given the Local's informed decision to participate in the national bargaining negotiations despite discrimination, because of the tangible economic benefits a national contract promised to its members, we find the argument unpersuasive." *Id.* at 1263.

It is clear, then, on review of the *Rodriguez* and *Sabala* cases, that the fact that the individual membership of a local union may have actually voted against a seniority provision which perpetuates past discrimination does not provide a defense to local union liability. In this case the defendant International asserts the converse of the arguments of the unions in the *Sabala* and *Rodriguez* cases, arguing that since the local union might have eliminated the discriminatory seniority provisions in the collective bargaining agreements, its failure to do so effectively excuses the International Union's nonfeasance in this area. This argument misconceives the obligation of unions in general, and international unions in particular, to eradicate the effects of discriminatory seniority provisions contained in their collective bargaining agreements. *E.E.O.C. v. Detroit Edison Co., supra.*

In the instant case, the agreements in issue were negotiated under the de jure if not the de facto control of the

---

6. This witness, Mr. C. P. Cook, testified that he conducted a meeting concerning a possible rider providing for carryover seniority in 1969 or 1970, shortly before the effective date of the first collective bargaining agreement in issue. Mr. Cook testified that approximately 12 of the 15 or 16 employees at this meeting were black.

defendant International; and there is no indication that the International has taken any action whatsoever to alleviate their discriminatory contents. Unlike the agreements in the *Sinyard* case, the agreements in issue here were negotiated on a system wide and a conference wide basis. But for the existence of an International Union in this case, there would be no such agreement. Moreover, the evidence in issue clearly shows that the national and area contracts become effective upon acceptance by a vote of a majority of union members. Thus, irrespective of the desires of the local union, company employees as a whole will be bound by the provisions of these agreements. As a result, the fact that certain members of a division or divisions at one terminal may have voted either for or against the area wide seniority system is no excuse for the discriminatory effects of that system. This is a system wide case, governed by system wide policies of discrimination. But for the existence of the International Union, these policies could not be effectively perpetuated by the existence of the system wide seniority system. As a result, this court has concluded that the International Union must be held liable for the discriminatory effects of this seniority system. The defendant International's arguments to the contrary are without merit.

In sum, this court has concluded that the plaintiffs' statistical evidence, which is corroborated by oral testimony, establishes a prima facie case showing a pattern and practice of racial discrimination with respect to hiring and job assignments throughout the Southern Conference area. The seniority system incorporated in the collective bargaining agreements in issue here effectively perpetuates this discrimination by precluding transfer between job categories and locking plaintiffs into their lower paying, less desirable jobs. In addition, this court has concluded that plaintiffs' statistical evidence, when corroborated by oral testimony, shows discrimination by defendants with respect to job assignment, on-the-job training, and other day-to-day employment activity within the respective employment divisions of the defendant Company's Atlanta terminal. As a result of this discrimination, the members of the class certified in this action have been invariably relegated to the lower paying, less skilled jobs. Finally, this court has concluded that the defendant International Union may be held jointly liable with the defendant Local and the defendant Company for the pattern and practice of racial discrimination in employment evident here. Thus, the remaining questions for consideration concern the proper parameters of the class certified in this action; the question of whether the defendants have rebutted plaintiffs' prima facie case of discrimination; and finally, the question of the appropriate remedy. These remaining questions will be discussed seriatim.

## THE PARAMETERS OF THE CLASS

As noted above, in the Fall of 1974, this court granted plaintiffs' motion for certification of this action as a class action and defined the class to include "all black employees of Motor Convoy, Inc., excluding office and supervisory personnel, who are employed, or who were employed and have been discharged or laid off since July 2, 1965, within the Southern Conference of Teamsters. . . . " *Freeman v. Motor Convoy, Inc.,* 68 F.R.D. 196, 203, 19 Fed.R.Serv.2d 650, 653 (N.D.Ga.1974). Plaintiffs sought reconsideration of this order insofar as the court refused, at that time, to define the class to include job applicants as well as employees. Plaintiffs' motion for reconsideration was denied by an order dated January 9, 1975, in which this court concluded that plaintiffs had not shown that they were entitled to represent the proposed class of job applicants, both in terms of the "typicality" requirement of Rule 23(a)(3), Fed.R.Civ.P., and in terms of the "technical standing" requirements of § 706(a) of Title VII. See 68 F.R.D. 204. This conclusion is supported by the result in *Alpha Portland Cement Co. v. Reese,* 507 F.2d 607 (5th Cir. 1975), in which the court ruled that the Title VII "like or related" test expressed in *San-*

*chez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970), did not constitute a jurisdictional prerequisite to suit under 42 U.S.C. § 1981. The court noted, however, that its jurisdictional conclusion

> does not mean that likeness or relatedness has no relevance in such a suit. Rule 23 is still on the books, and the trial judge defining classes and subclasses, deciding who are proper class representatives and exercising the broad discretion he enjoys in employment discrimination class action cases may find "like or related" to be a tool in his analysis with regard to the calls of Rule 23.

*Id.* at 610.

On review of the evidence, it is clear that plaintiffs' statistics are supported by specific evidence tending to show overt discrimination with respect to employment applications by blacks. On the other hand, it is likewise clear that the charges of discrimination filed by plaintiff Freeman and plaintiff Spencer did not raise claims of hiring discrimination before the E.E.O.C. These charges raised specific claims with respect to discriminatory job classifications, discriminatory advancement, discriminatory layoffs and recalls, and discriminatory pay; there are no allegations contained in these charges with respect to discriminatory hiring practices. As a result, the named plaintiffs would arguably be precluded from raising such claims in this lawsuit if the instant action were filed solely under Title VII. *Sanchez v. Standard Brands, Inc., supra.* This court has likewise concluded that the named plaintiffs may not represent a class of job applicants, insofar as this action is predicated on 42 U.S.C. § 1981.

 Even if the named plaintiffs were not precluded from representing a class of job applicants by the "like or related" test, the recent trend of author-

ity supports the proposition that plaintiffs who are present employees and who were never denied employment on account of their race, do not have standing to represent a class composed of job applicants who were never hired in any capacity by the defendant. *E.g., E.E. O.C. v. Detroit Edison Co., supra; Booth v. Prince George's County,* 66 F.R.D. 466, 9 E.P.D. ¶ 9924 (D.Md.1975). Although the authority in this area is not uniform, this court has concluded that under the "like or related" test and under the more traditional standing or nexus requirement of Rule 23, named plaintiffs in this lawsuit should not be permitted to represent a class of unnamed job applicants. Moreover, the interest of the named plaintiffs, insofar as those interests may be affected by awarding retroactive seniority to job applicants,[7] may be deemed adverse or antagonistic to the interests of a putative class of job applicants. In that regard, this court agrees with the following comments:

> It is distinctly possible that persons who were rejected for employment or deterred from applying would have interests different from those black persons who were actually employed . . . . It appears that in order to satisfy Rule 23(a)(4) at least two subclasses would have been necessary to represent groups other than actual black employees . . . and that individual plaintiffs having interests in common with the members of the two sub-classes would be required. *See Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 499 (5th Cir. 1968). We recognize that every Title VII action is in effect a class action and that a liberal construction should be given to the requirements of Rule 23(a)(2) and (3), and that there be questions of law or fact common to the class and that the claims of the representative parties are typical of those of the class. . .

---

7. As discussed below, the courts in this circuit have uniformly rejected "bumping" as a viable remedy for past discrimination in employment. Although plaintiffs seek retroactive seniority for the putative class of job applicants, they concede that this issue is pretermitted pending

an authoritative ruling by the Supreme Court. *See Franks v. Bowman Transportation Co.,* 495 F.2d 398, 417–18 (5th Cir. 1974), *cert. granted,* 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1975).

Nevertheless, though a broad definition of commonality of interests and typicality of claims is desirable, there remains a duty upon the court to consider carefully the requirement of fair and adequate protection in view of the serious consequences of *res judicata* in class actions.

*E.E.O.C. v. Detroit Edison Co.,* at 311. Furthermore, as noted by the court in *Detroit Edison Co.,* "[t]he limitation of the class represented by private plaintiffs to actual employees . . . does not necessarily deprive persons outside the class of the benefits of this action." *Id.* at 311 (considering aspects of the suit brought under § 707 of Title VII). Although the Government is not a party to the instant suit under § 707, this court has previously noted that "denial of class action treatment does not affect the scope of remedies available under the Civil Rights Statutes." *Freeman v. Motor Convoy Inc.,* 68 F.R.D. 208 (on reconsideration). *See Tolbert v. Western Electric Co.,* 56 F.R.D. 108 (N.D.Ga.1972). As a result, redefining the class to include job applicants would only affect defendants' potential back pay liability, and in this case provide a fortuitous windfall to those persons ultimately deemed entitled to such relief. As a result, this court has concluded that redefining the class to include applicants is not warranted.

The remaining issue for consideration concerns the appropriate cut-off date for class membership insofar as entitlement to back pay is concerned, an issue which was specifically left open by the prior order of this court. 19 Fed.R. Serv.2d at 653 n. 2. Although the questions presented raise unsettled questions of law, *see Sinyard v. Foote & Davies,* —— E.P.D. ——, Civil Action No. 17049 (N.D.Ga. Sept. 19, 1975), the parties have not briefed this issue. Plaintiffs implicitly contend that the tentative cut-off date for class membership previously adopted by this court, July 2, 1965, is also the appropriate date for determining eligibility for back pay. This contention is incorrect. Title VII now contains its own period of limitations for back pay relief: "Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission." 42 U.S.C. § 2000e–5(g). This provision was added by amendment on March 24, 1972, and applies to all charges pending before the Commission at that time or charges filed thereafter. As the complaint in the instant action was filed before this date, it appears that this limitation provision may not apply. On the other hand, it is evident on review of copies of the various E.E. O.C. charges and "right to sue" letters admitted into evidence in this case, that some of the charges giving rise to this suit were apparently pending after the suit was filed. It appears that the earliest of these charges was filed by intervenor Spencer· on February 12, 1970; however, a "right to sue" letter with respect to this charge was not issued until May 3, 1973. The potentially confusing problems resulting from this sequence of dates is not a factor in this case; for it is well settled in this jurisdiction that the applicable period of limitations for back pay relief under State law is also two years. *E.g.,* Georgia Code Ann. § 3–704; *Franks v. Bowman Transportation Co.,* 495 F.2d 398, 405–06 (5th Cir. 1974); *United States v. Georgia Power Co.,* 474 F.2d 906, 922–25 (5th Cir. 1973); *Stroud v. Delta Airlines, Inc.,* 392 F.Supp. 1184, 1190 n. 3 (N.D.Ga.1975). Moreover, although the tolling rules with respect to § 1981 claims differ, *see Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), this court agrees that the filing of an E.E. O.C. charge tolls the applicable statute of limitations, whether federal or state, with respect to back pay liability under Title VII. *E.E.O.C. v. Detroit Edison Co., supra,* at 315. As a result, this court has concluded that the members of plaintiffs' class may not recover back pay for any period more than two years in advance of the filing of intervenor Spencer's E.E.O.C. charge on February 12, 1970.

Limiting the class for back pay purposes to persons employed since Febru-

ary 12, 1968, does not dispose of all the issues presented in this regard. As noted in *Sinyard v. Foote & Davies, supra,* an argument may also be made to the effect that persons who terminated their employment more than 180 days in advance of the E.E.O.C. charge forming a basis for suit should not be deemed eligible for relief. *See Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3rd Cir. 1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). This result is predicated on the principle that the 180 day requirement provided by 42 U.S.C. § 2000e–5(e) constitutes a jurisdictional prerequisite to suit. *E.g., Pacific Maritime Assoc. v. Quinn,* 491 F.2d 1294 (9th Cir. 1974); *Macklin v. Spector Freight Systems, Inc.,* 478 F.2d 979 (D.C. Cir. 1973); *Moore v. Sunbeam Corp.,* 459 F.2d 811 (7th Cir. 1972); *Loo v. Gerage,* 374 F.2d 1338 (D.Hawaii 1974); *Georgia Power Co. v. E.E.O.C.,* 295 F.Supp. 950 (N.D.Ga.1968), *aff'd,* 412 F.2d 462 (5th Cir. 1969). At the time of this court's order in the *Sinyard* case, this question was unsettled in light of a recent opinion in this Circuit apparently rejecting the "jurisdictional prerequisite" concept, *Reeb v. Economic Opportunity Atlanta, Inc.,* 516 F.2d 924 (5th Cir. 1975); however, it now appears that the *Reeb* case has been limited to its facts. *See East v. Romine, Inc.,* 518 F.2d 332 (5th Cir. 1975). In *East,* the United States Court of Appeals for the Fifth Circuit joined the weight of authority in ruling that the 180 day requirement is a jurisdictional prerequisite to suit. In light of *East,* this court will follow the result in *Wetzel v. Liberty Mutual Insurance Co., supra,* and rule that persons who terminated their employment more than 180 days before February 12, 1970, may not be included within plaintiffs' class for back pay purposes.[8] *Cf. McMonigle v. Delta Airlines, Inc.,* Civil Action No. 74–1863 (N.D.Ga. July 7, 1975).

Accordingly, for the reasons hereinabove expressed, the class previously certified in this action will be redefined to include the following sub-classes:

(Class One) All black employees of Motor Convoy, Inc., excluding office and supervisory personnel, who are employed or who were employed and have been discharged or laid off since July 2, 1965, within the Southern Conference of Teamsters.

(Class Two) All incumbent black employees employed as Garage ("Shop") or Yard employees at defendant Motor Convoy's Atlanta (Hapeville) facility.

(Class Three) All incumbent black employees within the Southern Conference of Teamsters employed as over-the-road drivers who have previously transferred from job classifications in the Garage ("Shop") or Yard and who were not allowed to carry over their company seniority for bidding and other purposes.

(Class Four) All incumbent black employees, excluding office and supervisory

---

**8.** It is well settled in this jurisdiction that an individual claimant need not exhaust his administrative remedies by filing a charge with the E.E.O.C. in order to participate in an award of back pay. *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 256 (5th Cir. 1974). *See Franks v. Bowman Transportation Co., supra.* On the other hand, the *Pettway* court did not consider the question of whether persons who were barred by the 180 day requirement from seeking back pay relief under Title VII could nevertheless be included within a class potentially entitled to back pay. Arguably, persons barred by the 180 day rule could participate in such an award under 42 U.S.C. § 1981; however, the period of limitations for back pay under § 1981 is two years. Ga.Code Ann. § 3–704; *Stroud v. Delta Airlines, Inc., supra.* As the period of limitations under § 1981 is not tolled by filing an E.E.O.C. charge, *Johnson v. Railway Express Agency, supra;* and because the instant complaint was not filed until February 9, 1972, back pay may not be awarded under this statute for any period before February 9, 1970. As a result, utilizing the 180 day requirement as the cut-off date for back pay purposes actually provides a greater period of eligibility than would be available under § 1981. Of course, the period of limitations for equitable relief for employment discrimination in Georgia is 20 years, as potentially limited by laches or the effective date of Title VII. *See Franks v. Bowman Transportation Co., supra* at 405–06; *Pettway v. American Cast Iron Pipe Co., supra* at 255–56. As a result, limiting the class for back pay purposes does not affect their entitlement to equitable relief.

personnel, within the Southern Conference of Teamsters who were employed on or after February 12, 1968.

(Class Five) All former black employees, excluding office and supervisory personnel, who were employed within the Southern Conference of Teamsters and have been discharged or laid off since August 16, 1969.

## DEFENSES AND THE APPROPRIATE REMEDY

In sum, this court has concluded that plaintiffs' statistical evidence and other testimony is sufficient to constitute a prima facie case of racial discrimination in employment. Defendants have discriminated against black applicants for employment on account of their race and defendants have also discriminated against black employees by assigning them to lower paying, less desirable jobs, and by refusing to recognize their equal right to promotional opportunities and on-the-job training. Defendants' past history of employment discrimination has been perpetuated by the seniority rules incorporated in the collective bargaining agreements in effect at all times pertinent to this suit. These agreements insure that the members of plaintiffs' class are effectively locked into their lower paying, less desirable jobs, with no adequate opportunity to transfer into more desirable jobs. As a result, the defendant Company and the defendant Unions are jointly and severally liable for the continuing discriminatory effects of the seniority system presently in effect at the defendant Company's Southern Conference terminals, unless defendants can show that this seniority system is justi-

fied by a "business necessity." *Franks v. Bowman Transportation Co., supra; Pettway v. American Cast Iron Pipe Co., supra.*

 Defendants may, in the first instance, rebut plaintiffs' prima facie case by showing that the relevant labor pool lacks minority persons qualified to serve in the particular position. *Rodriguez v. East Texas Motor Freight, supra.* Of course, this possibility presupposes that certain objective "qualifications" are actually required as a prerequisite to employment; and the evidence in the instant action shows that no such objective qualifications were required. Defendants' witnesses testified that experience was desirable, insofar as over-the-road driver positions were concerned; however, these witnesses also testified that the only ultimate qualifications were those set forth by certain Department of Transportation requirements.[9] Moreover, plaintiffs adduced some evidence that on occasion, even the minimal D.O.T. requirements may have been discriminatorily utilized as an excuse to refuse to hire black road drivers. Even if there were a bona fide experience requirement, in light of *Rodriguez v. East Texas Motor Freight,* this court would rule that such an experience requirement would be in and of itself inherently discriminatory since road driving experience has been historically unavailable to minority persons. *See id.* at 58–59. For similar reasons, the absence of objective criteria for judging eligibility for transfer or promotion from lower paying, less skilled to higher paying, more skilled jobs defeats any potential "business necessity" defense in the instant suit. As stated in *Rodriguez,*

---

**9.** Although the parties have not specifically relied upon the D.O.T. requirements, they have stipulated that the Company maintains the following stated requirements for eligibility for a road driver job: (a) The applicant must be 21 years of age; (b) the applicant must pass the I.C.C. physical; (c) the applicant must pass a driving test and an open book test on I.C.C. regulations; (d) the applicant must possess a valid driver's license; and (e) the applicant must have a good driving record. Although there is no dispute concerning the Company's

nondiscriminatory application of requirements (b) and (c), the parties disagree on the question of whether or not the other requirements were overlooked or waived with respect to White applicants, or more strictly applied with respect to Black applicants. For instance, although their testimony was directly refuted by the Company's witness, two of plaintiffs' witnesses testified that they were told they must be 25 years of age to be eligible for a road driver job.

[t]he business necessity test essentially involves balancing the need for the challenged practice or policy against its discriminatory impact. The business purpose must be "sufficiently compelling to override any racial impact"; it must "effectively and efficiently" carry out its business purposes; and *there must be no acceptable alternative practice.*

*Id.* at 56–57 (emphasis added).

Defendants' witnesses testified in some detail concerning the specialized experience necessary in the car haul industry; however, there is no testimony concerning any objective test or qualification utilized in determining whether potential road driver applicants will be able to effectively perform their tasks. As a result, it appears that the essence of defendants' hiring system is purely subjective and that the decision to hire or not to hire is based solely upon the discretion of the individual company official responsible for hiring at a particular terminal. Similarly, it appears that when a shop employee desires to transfer to a road job, the only ultimate qualification (other than the D.O.T. criteria) requires the employee to show a certain proficiency with the equipment after a probationary period during which he is trained in the use of the equipment by an experienced road driver. Thus, there is no indication that at any time pertinent to this suit, the members of plaintiffs' class would have been rendered ineligible or unable to transfer into road driving jobs, but for the no transfer and subsequently the no carryover seniority provisions in effect during the relevant time periods in question.[10] Thus, defendants have not rebutted plaintiffs' prima facie case; and defendants have not shown an adequate business necessity for the discriminatory seniority system in effect at the Company's Southern Conference terminals. Finally, it should be noted that in *Rodriguez,* the court indicated that a reasonable alternative to a no transfer rule, such as a "one-time-only transfer with seniority carryover" would be a viable alternative which vitiated the business necessity defense. *Id.* at 57.

As a result of the foregoing, this court has concluded that the members of plaintiffs' class are entitled to injunctive relief to eliminate the effects, both past and present, of defendants' pattern and practice of racial discrimination in employment. As an adjunct to injunctive relief, this court has likewise concluded that certain members of plaintiffs' class are potentially eligible for an award of back pay. *E. g., Rodriguez v. East Texas Motor Freight, supra; Franks v. Bowman Transportation Co., supra; Pettway v. American Cast Iron Pipe Co., supra. See also United States v. T.I.M.E.–D.C., Inc., supra; Sabala v. Western Gillette, Inc., supra.*

Accordingly, it is hereby ordered, decreed, and adjudged, that

## I. CLASS–WIDE RELIEF

### A. *General Provisions*

1. For the purposes of this decree and order, the Affected Classes shall be defined as follows:

*Class 1:* All black employees of Motor Convoy, Inc., excluding office and supervisory personnel, who are employed or who were employed and have been discharged or laid off since July 2, 1965,

---

**10.** The defendant Company has never permitted persons to transfer from shop or yard jobs to road driver jobs with carryover seniority. Certainly, prior to unionization, the yard and shop employees had no formal seniority to lose on transfer. On the other hand, there is some evidence to the effect that the members of plaintiffs' class were told they must actually resign their position to be eligible for transfer to the road driver department. This evidence is in dispute; and intervenor Spencer testified that he was permitted to transfer without formally resigning from the company. Moreover, it appears that Mr. Spencer was actually given an opportunity to subsequently retransfer into a shop job, despite the fact that the Company does not maintain a formal probationary period for transferees, except as provided by the portions of the collective bargaining agreements governing intradepartmental promotions.

within the Southern Conference of Teamsters.

*Class 2:* All incumbent black employees employed as Garage ("shop") or Yard employees at defendant Motor Convoy's Atlanta (Hapeville) facility.

*Class 3:* All incumbent black employees within the Southern Conference of Teamsters employed as over-the-road drivers who have previously transferred from job classifications in the Garage ("Shop") or Yard and who were not allowed to carry over their company seniority for bidding and other purposes.

*Class 4:* All incumbent black employees, excluding office and supervisory personnel, within the Southern Conference of Teamsters who were employed on or after February 12, 1968.

*Class 5:* All former black employees, excluding office and supervisory personnel, who were employed within the Southern Conference of Teamsters and have been discharged or laid off on or after August 16, 1969.

2. Defendant Motor Convoy, defendant Local 528, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers; and defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, their officers, agents, employees, successors, all persons in active concert or participation with them or with any of them, and all persons with knowledge of this Decree are hereby permanently enjoined from engaging in any act or practice at defendant Motor Convoy's Atlanta facility, or with respect to road driver jobs, anywhere throughout Motor Convoy's system within the Southern Conference of Teamsters, which has the purpose or the effect of discriminating against any individual because of his race or color. Defendant Motor Convoy shall hire, assign, promote, and transfer employees at the affected facilities without regard to race, and shall not discriminate against any individual at those facilities because of his race in any aspect of his employment.

**B.** *Transfer, Promotion, and Seniority*

3. Defendants are permanently enjoined from prohibiting or restricting transfers by employees who are members of Classes 1, 2, and 3 between different departments at Motor Convoy's Atlanta Terminal.

4. Defendants are permanently enjoined from prohibiting or restricting transfers by employees who are members of Class 1 between different departments and the road driver departments at each and all of defendant Motor Convoy's facilities in the Southern Conference of Teamsters.

5. Defendants are further permanently enjoined from prohibiting, discouraging or restricting transfers by members of Class 2 between the Garage ("Shop") and Yard departments at the Atlanta facility.

6. This injunction shall extend to both formal, written rules, or informal or occasional practices of any type. No disincentive to transfers, including but not limited to loan of applicable terminal or classification seniority shall attach to such Affected Class member's transfer opportunities.

7. Except as noted in paragraph 14, *infra,* whenever a member of any of the Affected Classes seeks transfer or promotion, or seeks to protect his job in a layoff, rollback, or re-assignment situation, the Affected Class member's company seniority [11] shall be his ap-

---

11. In this circuit, in applying the "rightful place" remedy for past discrimination in employment, the courts generally utilize a "qualification date" formula in computing the amount of seniority to be carried over on transfer to the new job or "rightful place." *E.g., United States. v. T. I. M. E.–D.C., Inc., supra; Rodriguez v. East Texas Motor Freight, supra; Bing v. Roadway Express, Inc.,* 485 F.2d 441 (5th Cir. 1973). On the other hand, in cases in which companies have employed purely subjective criteria, rather than objective testing or experience requirements in determining job eligibility, discriminatees may use "full company seniority" to compete for job openings. *E.g., Franks v. Bowman Transportation Co., supra.* See *Rodriguez v. East Texas Motor Freight, supra* at 64 n. 30.

plicable seniority for all purposes.[12] The applicable seniority of other Affected Class members competing with class members for jobs shall be similarly determined, for purposes of that competition only. When no Affected Class member is involved in a job competition, applicable seniority shall be determined in accordance with the Collective Bargaining Agreement.

8. For purposes of transfer, promotion, or hiring of members of Class 2 pursuant to this Decree, the job of journeyman mechanic shall be open to all class members who have not completed any specific period in any of the subordinate classifications, where such class member demonstrates sufficient qualifications and competency to perform the jobs listed following the period of training as set forth below in paragraph 20.

9. Within thirty (30) days after the entry of this Decree, defendant Motor Convoy is ordered to inform all employees in Affected Classes of their right to transfer or promote freely, without loss of seniority benefits and with carryover seniority, into any jobs in the yard, shop, or road driver departments for which they qualify, without regard to their race or color. This notice shall be personally directed and in writing. Prior to or simultaneous with the giving of this notice, defendant Motor Convoy shall specifically instruct its supervisory personnel of their obligations to adhere to and foster this system.

10. Persons so notified pursuant to paragraph 9 of this Decree shall have forty-five (45) days after receipt of notice to express their interest in transfer or promotion to different jobs. After this period has expired, when vacancies occur in any positions in which any member of these Affected Classes has expressed an interest, defendant Motor Convoy shall offer the position to the Affected Class member with the most terminal seniority, qualifications being sufficient. Each such person shall be afforded at least one opportunity for the desired transfer or promotion for which he is qualified. The priority consideration rights set forth in this decree shall be deemed waived if the afforded transfer or promotion is rejected.

11. All members of the Affected Class who so desire shall be entitled to demonstrate their driving skill to qualify for the over-the-road driving positions. They shall be allowed a reasonable period of time to familiarize themselves with company equipment prior to demonstrating their driving skills. Those who qualify shall be placed on the road driver seniority roster according to their hire date whenever a road driver "vacancy" occurs.[13]

**12.** In light of the fact that shop and yard employees were not unionized prior to 1969, an argument may be made to the effect that allowing the members of the Affected Classes to transfer to the road driver department with full company seniority places them in a better position than they could have achieved without the discrimination. *See Franks v. Bowman Transportation Co., supra* at 417 n. 17. Prior to unionization, shop employees, whether Black or White, could not transfer into the road driver department with carryover seniority. *See* note 10, *supra.* On the other hand, prior to unionization, the defendant company had never employed a Black road driver. As a result, this court has concluded that the fact that the members of plaintiffs' class could not have transferred into a job from which they were racially excluded with seniority they did not previously possess is no reason to refuse to allow them to transfer into their "rightful place" at this time. As discussed above, objective qualifications were never used in determining eligibility for road driver jobs; therefore, except as noted below, the members of the Affected Classes should be afforded full company seniority carryover on transferring to their new jobs. *Franks v. Bowman Transportation Co., supra.*

**13.** Courts in this circuit have refused to accept "bumping" as a viable remedy for past employment discrimination: "White incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings." *United Papermakers & Paperworkers v. United States,* 416 F.2d 980 (5th Cir. 1969), *cert. denied,* 397 U.S. 919 (1970). *See also* note 7, *supra.* In applying the "rightful place" approach, actual transfer to a desired job with carryover seniority is delayed until a "vacancy" occurs. *United States v. Hayes International Corp.,* 456 F.2d 112 (5th Cir. 1972). As a general rule, a vacancy occurs whenever a current, active employee retires, resigns or

12. For the purposes of paragraph 11 transfers, a road driver "vacancy" shall be deemed to occur whenever the Company expands its driving force by new hiring or whenever an active road driver retires, resigns or otherwise transfers from active driving status, thereby creating a job opening which would be filled by a newly hired employee. *See* note 13, *supra.* The retirement or transfer of an active road driver will not create a "vacancy" if the resultant job opening as an active driver would be filled by a driver recalled from layoff status.[14]

13. If a member of the Affected Class is afforded an opportunity to qualify and transfer to a road driver position pursuant to paragraphs 11 and 12, but elects to reject transfer, such a rejection shall constitute a waiver under paragraph 10, *supra,* of any right to subsequently transfer to the road driver department with company seniority.

14. All Class Members on the list for promotions to Mechanic positions shall be given seniority dates for bidding and layoff purposes pursuant to a procedure agreed upon by the parties; or failing that, to be submitted to this Court.[15]

15. All seniority, promotion, transfer, and layoff provisions of the present collective bargaining agreements between defendants are hereby modified and all future such agreements modified by this Decree to incorporate the provisions set forth herein.

C. *Hiring and Recruitment*

16. Subject to the availability of qualified Black applicants, defendant Motor Convoy shall fill road driving positions according to the following ratio: Motor Convoy shall hire at least one Black road driver for each White road driver hired during the period involved. This specific obligation shall cease when the number of Black road drivers em-

---

otherwise leaves the company's employment; and, at that point, discriminatees may transfer into the resultant "vacancy" in preference to newly hired employees.

**14.** In the instant case, an argument may be made that a road driver "vacancy" occurs whenever the Company expands its driver force by recalling laid off employees to active employment. *Cf. Gamble v. Birmingham Southern R. R.,* 514 F.2d 678 (5th Cir. 1975). In *Gamble,* the defendant company maintained a qualified pool of employees classified as railroad conductors who generally worked in other jobs. The Court ruled that qualified Black employees could bump into the extra pool of conductors with full carryover seniority, noting that "[t]his regrettable detriment to the pool of extra White conductors is not to be equated with bumping Whites from regular jobs." *Id.* at 685. Thus, the *Gamble* Court implicitly ruled that for transfer purposes, a conductor "vacancy" occurred whenever an employee from the extra pool was called to active employment as a conductor. Nevertheless, the result in *Gamble* did not actually affect any White employee's entitlement to active employment; nor did the remedy mandated in that case require the demotion or transfer of White employees. On review of the relevant cases, this court has concluded that the antibumping rule in this Circuit protects all current, active employees and all employees in layoff status, insofar as their right to priority recall is concerned. Thus, in the in-

stant case, this court has concluded that a road driver "vacancy" occurs whenever the Company expands its driving force by new hires, and not when the company recalls laid off road drivers to active driving status.

**15.** As noted above, promotions and eligibility for job classifications are generally determined by subjective criteria; however, the 1973 Collective Bargaining Agreement does set out some objective criteria for judging qualifications for the journeyman mechanic classification:

A Journeyman Mechanic shall be defined as one who has served four (4) years at the trade or any specialized branch thereof, and is qualified to perform the following operations or any specialized branch thereof: Maintaining, repairing of trucks, trailers and equipment; dismantling and rebuilding of internal combustion motors, vehicles, chassis and parts thereof including servicing of brakes and/or towing of defective equipment and other road service.

*Id.* Art. 83 § 4(b). Similarly, a person who has worked as an apprentice mechanic for two years may request a promotion to advanced apprentice "provided he is qualified to do the work." *Id.* Art. 83 § 1 n. 3. As a result, a modified qualification date seniority formula, *see* note 11, *supra,* may be appropriate for determining the seniority date of persons transferring to the mechanic classification.

ployed by Motor Convoy attains a fixed goal. That goal is either (a) 20% over the entire system within the Southern Conference of Teamsters, or (b) a ratio at each terminal reflecting the overall racial composition of the population in the surrounding metropolitan area.[16]

17. In hiring road drivers pursuant to this Decree, Motor Convoy shall apply the standard Department of Transportation standards for employment in a racially non-discriminatory fashion.

18. Defendant Motor Convoy, its officers, agents, employees and successors are hereby specifically enjoined from failing or refusing to hire Black persons for jobs which are or have been predominately held by Whites. Said parties are mandatorily enjoined to take the following steps to assure the provisions of equal hiring opportunities for these jobs:

(a) Motor Convey shall establish objective, fair, job-related, and non-discriminatory standards for hiring. Black applicants meeting these basic qualifications shall be fully considered without regard to race or color. Their applications shall be kept on file for at least twelve (12) months, and reviewed whenever pertinent vacancies occur.

(b) During the reporting period set forth *infra*, defendant shall maintain a permanent record of all Blacks applying for hiring, together with all pertinent data regarding job sought, qualifications, disposition of application, and reason therefor.

19. In order to assure that potential and former Black applicants are aware of employment opportunities formerly closed or limited to them, Motor convoy shall undertake an employee recruitment program aimed at the Black community of the metropolitan areas where it has terminals covered by this Decree.[17] Such a program shall include contact on a periodic basis, and at least once each calendar quarter, with employment agencies, job training organizations, and placement officers in predominately Black high schools, vocational schools, and colleges, as well as with local civil rights organizations such as the Urban League and the National Association for the Advancement of Colored People. If such communications fail to elicit a significant number of qualified Black applicants for employment, Motor Convoy shall undertake an advertising program in newspapers or on radio stations directed to and having general circulation in the Black community in the immediate geographical area. All such contacts, initiatives, and advertising shall specifically emphasize that Motor Convoy no longer discriminates on the basis of race in hiring for these positions.

## D. *Mandatory Training*

20. Defendant Motor Convey shall establish a training program for the position of mechanic at its Atlanta facility for members of Class 2. Those Affected Class members indicating an interest in promotion to the position of mechanic shall be provided such reasonable training and supervision for qualification. Defendant shall establish objective criteria for the determination of qualifications for promotion to the position of mechanic at its Atlanta terminal. The defendant Motor convoy shall fill any va-

---

**16.** The spector of "reverse discrimination" raised by employing quotas in affirmative hiring plans presents many complex issues which ultimately must be resolved by the Supreme Court. Pending an authoritative ruling on this issue, it appears that the imposition of hiring quotas constitutes permissible, if not mandatory relief in this Circuit. *See, e. g., Franks v. Bowman Transportation Co., supra; Morrow v. Crisler,* 491 F.2d 1053 (5th Cir. 1974) (en banc).

**17.** This court has concluded that the class certified in this action should not be redefined to include job applicants as well as present and former employees. *See* note 7 and accompanying text, *supra.* As a result, the instant action does not present critical and unsettled problems of bumping and constructive seniority for former applicants. On the other hand, in filling future job openings or vacancies, the Company should give first consideration, other factors being equal, to fulfilling its minority hiring and recruitment obligation by contacting those Black persons who have previously applied for jobs.

cancies in its position of mechanic first from the list of qualified Affected Class members until such list is exhausted.

### E. *Reporting*

21. Motor Convey shall maintain records of all applicants, hiring, assignment, promotions, transfers, and layoffs in its Atlanta terminal and with respect to road drivers, throughout its system within the Southern Conference. Local 528 shall maintain records of all grievances filed by Motor Convoy's Black employees in any of these connections.

22. Within a reasonable time, not to exceed thirty (30) days after entry of this decree, and every six months thereafter, Motor Convoy shall serve upon plaintiffs reports for its Atlanta terminal and for all road drivers, showing by department, job classification, and race, the following information:

(a) The total number of employees as of the end of the period.

(b) The number of persons hired, and the number of persons terminated during the period.

(c) The number of applicants for employment who were not hired during the period. If the individual's application is not pending at the end of the period, the name and address of all Black applicants who are no longer under consideration.

(d) The name and status of all members of the Affected Class who expressed an interest in transferring to over-the-road driver and other predominately White jobs under this Decree.

(e) Such reports also shall include documentation of the recruitment program undertaken by Motor Convoy pursuant to paragraphs 18 and 19 of this Decree.

(f) The job classifications required for reporting under the provisions of this Decree shall be all positions in the Garage ("Shop") and Yard at the Atlanta facility and all over-the-road positions throughout the Southern Conference.

### F. *Class Back Pay*

23. The parties shall confer at a mutually convenient time and place, and not later than twenty (20) days from the date of this order, regarding an appropriate form of notice to be afforded to Classes 4 and 5 informing them of their potential entitlement to back pay. If the parties are unable to agree on a time and place for this conference, then a time and place will be set by the court.

24. Not later than ten (10) days following the date of the above conference, the parties shall submit the agreed upon notice form to the court for its approval. As a minimum, this notice should briefly inform the members of Classes 4 and 5 of the disposition of the injunctive aspects of this lawsuit and of their potential entitlement to an award of back pay. Pursuant to Rule 23(c)(2), Fed.R.Civ.P., the notice should also inform potential claimants of their right to "opt-out" and seek separate relief, and of their right to appear with their own counsel. In addition, the notice form should inform potential claimants that unless they "opt-out" they will subsequently be barred from seeking separate monetary relief. If the parties are unable to agree on a proposed notice form, they should submit appropriate briefs on the issue not later than ten (10) days following the above conference.

25. Not later than ten (10) days following court approval of the notice form, defendants shall ensure that each member of Classes 4 and 5 receives *individually* a copy of the approved form by registered mail or other secure means.

26. The parties are directed to establish a procedure, including reference to a special master, if warranted, for the determination of back pay claims. If the parties are unable to agree to such a procedure within sixty (60) days from the date of this order, they should so notify the court and file briefs explaining their respective positions.

27. The court will entertain supplemental briefs on all issues relative to additional monetary relief in this matter, including "red-circling", provided that such briefs are filed not later than twenty (20) days from the date of this order.

## II. INDIVIDUAL CLAIMS AND OTHER INDIVIDUAL RELIEF

The named plaintiffs shall benefit from the foregoing provisions, as applicable to them.

## III. POSTING AND COMPLIANCE

A. In order to obtain greater assurance of compliance by defendant Motor Convoy with the terms of this Decree, it shall designate an official who will have responsibility for securing compliance with this Decree and, specifically, the designated official shall review or supervise effectively the processing of employment forms and applications and the files of unsuccessful Black applicants to more effectively avert or avoid the effects of discriminatory practices.

B. Motor Convoy shall post copies of this Decree at prominent locations in its Atlanta Terminal facilities and throughout its road driver network in the Southern Conference.

## IV. COSTS AND ATTORNEYS' FEES

Plaintiff and Intervenor shall recover their costs in this action, including reasonable attorneys' fees upon submission of time affidavits. The parties are directed to attempt to resolve the matter of attorneys' fees between them. Failing such resolution, they shall notify the Court and further proceedings will be heard.

## V. ALLOCATION OF COSTS, FEES, AND BACK PAY AWARDS

All awards of costs, attorneys' fees and back pay shall be borne by the defendants jointly. The defendants are directed to seek to allocate their costs among themselves. Failing such resolution, the Court will direct further proceedings.

## VI. RETAINED JURISDICTION

The court will retain jurisdiction of this case for a period of two years following disposition of the issue of individual entitlement to back pay for the purpose of issuing any additional orders necessary to enforce or clarify the implementation of this decree. At any time following the expiration of this period or upon attaining the overall employment goal set out in paragraph 16, *supra,* the defendants may move upon sixty days notice to the plaintiffs, and upon a showing of compliance with the terms and conditions of this Decree, for its modification or dissolution.

It is so ordered, this 10th day of December, 1975.

## ORDER

This action is presently before the court on plaintiffs' motion to alter or amend the order and decree of this court dated December 10, 1975 in two respects. First, plaintiffs seek redefinition of the class certified in this action to include job applicants as well as past and present employees. Secondly, plaintiffs seek an order redefining the term "vacancy" to provide that for transfer purposes, a road driver "vacancy" occurs whenever a road driver on layoff status is recalled to permanent employment.

This court has carefully reviewed plaintiffs' arguments concerning the class certification question and determined that those arguments must be rejected. In the December 10, 1975 order, the court refused to allow the named plaintiffs to represent a class of job applicants, concluding that the named plaintiffs had not satisfied the "typicality" requirement of Rule 23(a)(3), Fed.R. Civ.P., *e. g., E.E.O.C. v. Detroit Edison Co.,* 515 F.2d 301, 311 (6th Cir. 1975), and that they likewise had not satisfied the "technical standing" requirements of § 706(a) of Title VII, *e. g., Alpha Portland Cement Co. v. Reese,* 507 F.2d 607 (5th Cir. 1975); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970). In addition, the court noted that to the extent the putative class of job applicants might be entitled to retroactive seniority, the interests of the named plaintiffs would be antagonistic to the inter-

ests of the putative class.[1] *See* Rule 23(a)(4).

Relying on *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), plaintiffs argue that this ruling is inconsistent with the "make whole" purpose of Title VII, arguing also that plaintiffs should be allowed to represent a class of job applicants under *Long v. Sapp,* 502 F.2d 34 (5th Cir. 1974) and the "independent remedy" principle applicable to actions brought under Title VII and 42 U.S.C. § 1981. Finally, plaintiffs argue that any antagonism between subclasses may be cured by allowing the putative subclass of job applicants to appear with separate counsel.

■ This court agrees, that where the members of a certified class are otherwise entitled to Title VII relief, back pay should ordinarily be awarded to those class members as a matter of course. *Albermarle Paper Co. v. Moody, supra.* On the other hand, this court does not interpret the *Moody* case to effectively mandate an award of back pay to all persons possibly discriminated against irrespective of the parameters of the class and irrespective of the requirements of Rule 23. In that regard, this court has previously rejected plaintiffs' arguments predicated on the result in *Long v. Sapp, see* 68 F.R.D. 204 (reconsidering the class certification issue); and plaintiffs have cited no controlling authority or other compelling reasons for abandoning the "reconsideration" ruling

at this time. In fact, that ruling has been implicitly approved by the United States Court of Appeals for the Fifth Circuit. *Alpha Portland Cement Co. v. Reese, supra* at 610. This court is constrained to adhere to the *Reese* ruling and *Sanchez v. Standard Brands, Inc. supra* until directed to do otherwise by competent authority. *Cf. Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975).

■ Finally, this court does not agree that allowing the subclass of job applicants to appear with separate counsel will cure the potential antagonism between that subclass and the class of present and former employees. Although a potential conflict of interest with respect to the issue of retroactive seniority might also warrant disqualification of counsel, the question of a "disqualifying" antagonism between class members in term of "adequacy of representation" is a mandatory, rather than ethical, consideration under Rule 23(a)(4). *See generally Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3rd Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). This latter form of antagonism may not be cured by merely allowing the antagonistic subclasses to be represented by separate counsel. Plaintiffs' arguments to the contrary are without merit. Accordingly, insofar as plaintiffs seek an order redefining the class, their motion to alter or amend is denied.

1. Paragraph 7 of the December 10, 1975 decree, adopted substantially from paragraph 7 of plaintiffs' proposed decree, provides in relevant part as follows:

> [W]henever a member of any of the Affected Classes seeks transfer or promotion, or seeks to protect his job in a layoff, rollback or re-assignment situation, the Affected Class member's company seniority shall be his applicable seniority for all purposes. *The applicable seniority of other Affected Class members competing with class members for jobs shall be similarly determined,* for purposes of that competition only. (emphasis added).

Under these provisions, a job applicant who applied for a position in August, 1965, if given

retroactive seniority, would be entitled to preferential transfer when competing with a class member actually hired after that date. In fact, if such an applicant were qualified, as discussed more fully below, he would be entitled to be called to active road driver status in preference to plaintiff Spencer, who testified that he became a "permanent" employee in 1966 and who was on layoff status as of the time of trial. (Mr. Spencer also testified that his road driver seniority date was February 2, 1972). Thus, plaintiff Spencer's interest would clearly be antagonistic to the interest of the fictional 1965 job applicant. Plaintiffs do not contend otherwise.

In paragraph 11 of the December 10, 1975 decree, this court ruled that qualified employees desiring to transfer into the road driver departments at the various terminals in the Southern Conference area should be placed on the road driver seniority roster according to hire date whenever a road driver "vacancy" occurs. The court ruled that a "vacancy" would be "deemed to occur whenever the Company expands its driving force by new hiring or whenever an active road driver retires, resigns or otherwise transfers from active driving status, thereby creating a job opening which would be filled by a newly hired employee." At p. 1120. The court specifically declined to rule that a vacancy should be deemed to occur when the Company expanded its driving force by recalling laid off employees to active employment, concluding that such a ruling would be tantamount to allowing impermissible "bumping." *Id.* at note 14. Plaintiffs argue that this ruling should be amended in light of the result in *United States v. T.I.M.E.–D.C.*, 517 F.2d 299 (5th Cir. 1975), *cert. filed*, 44 U.S.L.W. 3309 (Oct. 29, 1975) (No. 75–639). In this case, the lower court had defined the term "vacancy" to exclude recalls from the layoff list unless the individual involved had been laid off for three consecutive years. *Id.* at 322 n. 44. The United States Court of Appeals for the Fifth Circuit concluded that this definition of a "vacancy" for transfer purposes was too narrow:

> [W]e believe that to allow LD's [road drivers] a three-year priority right on future openings would unduly impede the eradication of past discrimination. [citations omitted]. Therefore we modify the decree to provide that when a vacancy which is not a *purely temporary one* arises in the LD position . . . *any LD on layoff at that terminal may compete against members of the affected class on the basis of full employment seniority.*

*Id.* at 322–23 (emphasis added). Although this language is somewhat confusing,[2] the court nevertheless agrees with plaintiffs that the result in the *T.I.M.E.–D.C.* case requires amendment of the December 10, 1975 order.

Defendant Motor Convoy opposes plaintiffs' motion largely on the ground that the seasonal nature of its business coupled with the requirement for periodic layoffs distinguishes the instant case from the *T.I.M.E.–D.C.* case. Although this argument has some merit conceptually, it appears that the seasonal nature of the car-haul industry has been provided for in the collective bargaining agreements in issue.[3] Moreover, it likewise appears that the provisions of the National Master Freight Agreement presumably relied on by the district court in the *T.I.M.E.–D.C.* case, one of which provides that "Seniority shall only be broken by . . . more than a three (3) year lay-off . . . .", are similar to the provisions of Art. 5 § 1 of the 1973 National Master Automobile Transporters Agreement controlling in the instant case. As a result, this court has concluded that possible distinctions between the freight industry and the car-haul indus-

**2.** Presumably, the *T.I.M.E.–D.C.* court intended to refer to members of affected classes competing for positions with laid off line drivers rather than vice versa. In any event, the question sub judice is not one of allowing road drivers to compete with class members on the basis of company seniority (full employment seniority), but rather whether the members of the Affected Classes may transfer to a road driver position in preference to a laid off road driver.

**3.** Article 35 § 1 ¶ 1 of the 1973 Central and Southern Conference Areas Supplemental Agreements provides as follows:

Any employee hired as a seasonal, casual, or part-time worker shall not become a seniority employee under these provisions where it has been agreed by Employer and Local Union in writing that he was hired for seasonal, casual, or part-time work.

Plaintiff Spencer testified that he was initially hired as a "casual" employee assigned miscellaneous jobs, including the parking of trucks. Plaintiff Spencer did not become a permanent employee until 1966. It is clear, then, that both the Collective Bargaining Agreement and the defendant Company's hiring practices provide for seasonal fluctuations in workforce without affecting the seniority rights of "permanent" employees.

try do not constitute a permissible basis for departing from the ruling in *T.I.M. E.-D.C. Cf.* Order of December 10, 1975 pp. 1108–1109.

Accordingly, for the reasons hereinabove expressed, the provisions of paragraph 12 and footnote 14 of the December 10, 1975 order are hereby vacated and amended by inserting the following in lieu thereof:

12. For the purposes of paragraph 11 transfers, a road driver "vacancy" shall be deemed to occur whenever the Company expands its driving force by new hiring; or by recalls of more than thirty (30) days duration from the layoff lists; [14] or whenever an active road driver retires, resigns or otherwise transfers from active driving status, thereby creating a permanent job opening, *see* note 14, *supra*, which would be filled by a newly hired employee or by an employee recalled from layoff status.

New footnote 14 shall provide as follows:

14. The ruling in the *T.I.M.E.–D.C.* case indicates that the priority rights provided by this decree should not apply when a laid off road driver is recalled as a result of a "temporary" vacancy. Unfortunately, the court did not elaborate on the term "temporary" by distinguishing temporary from "permanent" recalls. Moreover, in the employment context, as well as in other contexts, the term "temporary" has been subject to varying interpretations, depending on the nature of the particular case. *See, e.g., Foor v. Torrington Co.,* 170 F.2d 487, 489–90 (7th Cir. 1948) (permanent vs. temporary employee for Selective Service Act purposes). *Accord Brickner v. Johnson Motors,* 299 F.Supp. 1005 (N.D.Ill.

1969). *See generally Boone v. United States,* 482 F.2d 417, 419 (5th Cir. 1973) (distinguishing "temporary" from "indefinite" or permanent employment for tax purposes). Fortunately, this court need not attempt to give content to this imprecise term, for the 1973 Collective Bargaining Agreement effectively provides a 30-day cut-off date for distinguishing temporary from permanent employment in the layoff context. *See* Art. 37 § 5 of the 1973 Central and Southern Conference Areas Supplemental Agreements. The relevant provisions of the Agreement permit a road driver on layoff status to transfer to another terminal on a temporary basis when "additional help" is needed at the other terminal. The duration of this "temporary" transfer is limited to 30 days. Drivers who elect to transfer and work for longer than 30 days lose terminal seniority and are not allowed to freely retransfer to their old terminals. In the interest of apparent, if not actual consistency with these provisions, this court has concluded that a "permanent" job opening is a job of more than thirty days duration and that in the case of a "vacancy" of shorter duration the provisions of the Collective Bargaining Agreement should control as opposed to the provisions of this order.

In sum, this court has granted in part and denied in part plaintiffs' motion to alter and amend the December 10, 1975 order. Portions of that order and decree providing for transfer of Affected Class members into road driver jobs with carryover seniority have been modified in accordance with the terms of this order.

IT IS SO ORDERED.