Jack A. GAMBLE et al.,
Plaintiffs-Appellants,

v.

BIRMINGHAM SOUTHERN RAILROAD COMPANY et al., Defendants-Appellees.

No. 74–2105.

United States Court of Appeals,
Fifth Circuit.

June 16, 1975.

Demetrius C. Newton, Birmingham, Ala., Jack Greenberg, Robert Belton, Barry L. Goldstein, New York City, for plaintiffs-appellants.

Carol Lynn Green, EEOC, Washington, D. C., for amicus curiae.

James R. Forman, Jr., J. Frederic Ingram, Birmingham, Ala., for Birmingham So. R. R.

Clarence M. Small, Jr., Birmingham, Ala., for Union.

Before WISDOM and DYER, Circuit Judges, and KRAFT,* District Judge.

DYER, Circuit Judge:

This Title VII[1] suit alleges racial discrimination in promotional opportunities. Plaintiffs are a class of black switchmen who are or might be employed by Birmingham Southern Railroad Company (Railroad). Defendants are the employer Railroad and the United Transportation Union (Union) and its Local 1887 (Local). The district court made findings of fact and concluded as a matter of law that defendants have had no post-Civil Rights Act policy or practice which denied black switchmen promotional opportunity, that plaintiffs have shown no racially discriminatory pattern, practice, or motive on the part of the defendants, and that therefore the plaintiffs are entitled to no relief. We reverse.

The record here fully documents the long struggle by the plaintiff class to vindicate its rights. Each named switchman has at least twenty, and some have more than thirty years' seniority with the Railroad. For over twenty years they have been seeking the right to promote to conductor. In 1966, one year after the Civil Rights Act gave them the legal tools to enforce that right, they filed a complaint with the Equal Employment Opportunity Commission. After the EEOC investigated the charges and attempted conciliation, it gave the switchmen a "right to sue" letter in September, 1968. They filed a complaint in October, 1968. But the laborious process had just begun. It was four and a half years until the trial took place, one year more until the district court entered judgment, and another year until this appeal was argued, making six and one-half years in litigation, nine years since the EEOC charge was filed.

I. The Background

The general historical pattern of racial discrimination at the Railroad parallels that in the railroad industry and is detailed in the district court's findings of fact. We summarize as much of this background and describe as much of the operation of the Railroad as is necessary for understanding the problem before us.

"Yard" work, the job of moving, switching, and handling railroad cars, both within the yard and on extended runs, is done by switchmen and conductors. "Switchman" is the entry-level job in the yard. Switchmen couple and uncouple cars, adjust and line up switches,

---

* Senior District Judge of the Eastern District of Pennsylvania, sitting by designation.

1. Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq.

"settle" and "bleed" air from the brakes, and classify and identify cars for movement. A "conductor" is the leader or foreman of a switching crew (usually made up of two switchmen and a conductor) and, of course, he earns more money than a switchman. He learns his job by first serving as a switchman. The basic work of the two classes is the same, but the conductor has overall responsibility and, accordingly, does what paper work is required for the crew.

Switchmen and conductors are now considered one craft, yardmen, and are now represented by the same union, but the history has been one of segregation, both in the yard and in the union. Before 1935, the two jobs were strictly segregated by race; black employees were hired as switchmen and whites as conductors. After 1935, all yardmen were hired first as switchmen, but all whites, and only whites, were soon promoted to conductor. Thus, except for those white initiates among the switchmen, who moved up quickly, all switchmen were still black, all conductors white. This situation obtained until 1972, long after the institution of this suit, when the first blacks were promoted to conductor.

Until 1967, the two classes were represented by separate unions, switchmen by the United Association of Iron, Steel and Mill Workers, and then the United Steelworkers of America, and conductors by the Brotherhood of Railroad Trainmen (BRT). In 1967, the BRT became the authorized representative of both switchmen and conductors, and was succeeded by the United Transportation Union.

All conductors hold seniority as of their date of hire as switchmen. They also hold seniority as switchmen. Switchmen, however, have only their switchman seniority.

The work of the Railroad is done by crews, usually made up of two switchmen and one conductor. Crews work either on "regular" or on "extra" runs or assignments. The number of regular runs operating has averaged between thirty and forty over the past several years. One initially acquires a regular run by bidding on it in a manner prescribed by the collective bargaining agreement. The most senior man bidding is given the run. Of course, only one qualified as a conductor may bid on conductor openings. Runs are advertised for bidding when a vacancy occurs in an existing run, for example through retirement, death, or promotion, or when someone gives up a regular run for any reason.

In addition to regular runs, a considerable amount of the work of the Railroad is done by extra crews working on a temporary basis. Extra men are needed to fill temporary vacancies caused by illness or vacation. Also, during the period of advertisement for bids, a run is filled temporarily by extra men. Both conductors and switchmen have an "extra board," from which these temporary crews are established on a rotational basis. The need for extra crews and the resulting number of men needed for the extra board are evaluated each week by representatives of management and the union. One bids for a position on the extra board. A conductor may give up a regular assignment and exercise his seniority to displace someone from the extra board, but not from a regular assignment. A conductor, then, may work on regular assignment, or on the extra board. If there are no conductor jobs available he may also work as a switchman, the only restriction being that, under the collective bargaining agreement, he cannot bid on a switchman job if there are any conductor openings on which he could bid. This provision corrected a long-standing problem of conductors "rolling back" to exercise their seniority over switchmen while junior conductors were still working; thus, if work was short, all whites were working while more senior blacks were laid off.

The gravamen of the black switchmen's claim is that they have consistently been denied the right to qualify as conductors. The question of how a switchman goes about being promoted to conductor is therefore vital to this case. The collective bargaining agreement has

provided since 1936 that switchmen shall be promoted in order of their seniority with the company. Until 1972, however, only whites were so promoted. When company officials decide to promote a switchman,. they indicate such to him. He then takes a written test and is interviewed orally to qualify as a conductor. There is no dispute that at the time this suit was filed in 1968, and for four years after, no black had ever been allowed to take the conductor test. There is also no dispute here as to the ability of the black switchmen plaintiffs to do the work of conductor; indeed, there is no contradictory evidence in the record on this point. Of the original charging parties, all have at least twenty years of seniority with the Railroad. Many of these men have trained white switchmen who were then promoted over them to conductor. Regarding their ability, the district court made these comments:

> Observation of the black switchmen who testified as witnesses at the trial of this case and consideration of their testimony has convinced the Court that their experience on the job has equipped them to perform the duties of a conductor.

Further, the switchmen do not seek automatic promotion to conductor; they merely want the opportunity to take the qualifying test.

## II. The Law

The record exposes a long history of racial discrimination. Indeed, the district court stated that the pre-Act discrimination practiced by the Railroad was "crystal clear." The court went on, however, to find no post-Act discrimination, emphasizing the lack of discriminatory action or motive. It denied the switchmen any relief. In this it erred.

It is well settled that a classification born in segregation and freezing one racial class in an inferior position cannot stand. An employee has a *present* right not to be discriminated against on account of race. Local 189,

United Papermakers and Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, 988. This right is violated each time the "old racial classification reasserts itself, and the Negro suffers anew for his employer's previous bias," even if an employer has maintained racially neutral policies since the Act went into effect. *Id.* The Supreme Court has made it clear that:

> [u]nder the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.

Griggs v. Duke Power Co., 1971, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158.

Therefore, we need not look behind the Railroad's protestations of good motive; good motives are irrelevant if the black switchmen have been locked into a disadvantageous position resulting from past discriminatory practice. Pettway v. American Cast Iron Pipe Co., 5 Cir. 1974, 494 F.2d 211, 223; Rowe v. General Motors Corp., 5 Cir. 1972, 457 F.2d 348, 355. Our own review of the record reveals that as of the trial date, April, 1973, there were 106 names on the switchmen's seniority list (which of course includes conductors, because they hold switchmen's seniority), 97 of whom were hired before the effective date of the Civil Rights Act, 1965. Of those, 6 were former Federal Barge Line employees who came in as a result of a merger and with whom we are not concerned here. This leaves 91 persons, 37 black, 54 white. Of these 54 whites, 53 were conductors.[2] The only white man on the list who was not a conductor had been promoted to conductor earlier, and then disqualified for, among other things, "poor judgment." Of the 37 blacks, 4 were conductors, but they had been promoted only a few months before trial, fully 4 years after this suit was filed. Many black switchmen had greater seniority than *any* white conductor,

---

2. A number of these (twenty as of January, 1972) were not working as conductors. Many

had been promoted to supervisor or yardmaster, and some were disabled.

and *all 37* had greater seniority than at least 6 white conductors. When these kinds of figures speak a court would have to be deaf not to hear.

■ Parenthetically, we are not impressed by the fact that four blacks had been promoted just before trial. It does not constitute a defense to plaintiffs' charges, nor does it moot the issues. Rowe v. General Motors Corp., *supra* at 359. Nor do we question the representation made to this Court that numerous additional promotions have taken place during this long litigation. We have earlier commented upon this phenomenon:

> Our research leads us to conclude that often the acts relied upon as evidencing good faith are taken in response to the lawsuit filed by the discriminatee. "Such actions in the face of litigation are equivocal in purpose, motive and permanence." Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968), quoting Cypress v. Newport News General and Nonsectarian Hospital, 375 F.2d 648, 658 (4th Cir. 1967). *See also* Rowe v. General Motors Corp., 457 F.2d 348, 355 (5th Cir. 1972); Local 53 of the International Ass'n of Heat and Frost Insulators & Asbestos Workers v. Vogler, 407 F.2d 1047, 1055 (5th Cir. 1969).

Johnson v. Goodyear Tire & Rubber Co., 5 Cir. 1974, 491 F.2d 1364, 1376–77 n. 36.

Therefore, what was originally an avowedly racial classification continues to the present. The switchman class is predominantly black, the conductor class white. Blacks continue to be prevented from qualifying as conductors and so to be prevented from bidding for jobs which no one questions their competence to handle, and which are presently executed in many cases by whites with less company seniority. Thus, because the record unequivocally shows that long-standing racial classifications continue to disadvantage the blacks in the inferior class, the switchmen are entitled to the remedial benefits conferred by the Civil Rights Act, without which the aims of Title VII could not be effectuated. Pettway v. American Cast Iron Pipe Co., *supra* at 236; Johnson v. Goodyear Tire & Rubber Co., *supra*; United States v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906, 927; United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, 458.

### III. The Remedy

Because the refusal to allow blacks to promote to conductor since the Act went into effect is a violation of Title VII, the question is, as always, "how far the employer must go to undo the effects of past discrimination." Local 189 v. United States, *supra* at 988. This Court has made it clear that relief is to be granted within the framework of the "rightful place" theory. Pettway v. American Cast Iron Pipe Co., *supra* at 243. Although "[q]ualified negroes with greater seniority cannot displace incumbent workers . . ., they are to be given a preference for future vacant jobs absent a compelling business reason." United States v. Hayes International Corp., 5 Cir. 1972, 456 F.2d 112, 118. The Civil Rights Act, as we have construed it, "prohibit[s] the *future awarding* of vacant jobs on the basis of a seniority system that 'locks in' prior racial classification." Local 189 v. United States, *supra* at 988.

The argument on appeal has concentrated on the meaning of the word "vacancy" under the rightful place theory. The Railroad asserts that a vacancy occurs when it decides that it needs more conductors, and that between 1957 and 1972 it had no vacancies, and so made no promotions. Plaintiffs assert on the other hand that many conductors have died, retired, or been promoted, leaving numerous vacancies during that period. The Railroad claims that it is its sole prerogative to determine when it needs additional conductors. When the Railroad decided it needed conductors in 1972, it promoted four switchmen, all black. Thus, it says, blacks are already being accorded their "rightful place."

The argument must fail. The court found that there were no promotions "because there was no business or other necessity requiring such promotions." This states the "business necessity" test backward. Because blacks who admittedly possess both competence and seniority are prevented from working in conductor jobs, the Railroad must show that there is a "business necessity" for continuing this practice.

The *only* justification for standards and procedures which may, even inadvertently, eliminate or prejudice minority group employees is that such standards or procedures arises from a non-discriminatory legitimate business necessity.

.     .     .     .     .

"[L]egitimate business necessity" is the one and only justification for standards or procedures which operate to deny Blacks promotional opportunity.

Rowe v. General Motors Corp., *supra* at 354. In determining whether something is a business necessity, we must keep in mind that "management convenience and business necessity are not synonymous." United States v. Jacksonville Terminal, *supra* at 451. "Necessity connotes an irresistible demand." United States v. Bethlehem Steel Corp., 2 Cir. 1971, 446 F.2d 652, 662.

■ Absent a true business necessity, then, the Railroad must allow the black switchmen to qualify as conductors. The only other limitation on the remedy is that incumbent whites cannot be displaced. With these two requirements in mind, let us re-examine the promotion situation at the Railroad.

In the usual business, a finite, ascertainable number of higher-level positions are required. However, efficient running of the Railroad requires that, in addition to the regular crews, there be a pool of persons qualified to work as conductors. These conductors in the pool make up the extra board or work as switchmen. When working as switchmen, they are paid as switchmen. No reason appears in this record why the Railroad should suffer any detriment by having a large pool of available conductors. A representative of the Railroad testified that it cost the Railroad nothing to qualify men, and that the Railroad had no interest in who served as conductors, as long as they were qualified.

Indeed, earlier in the history of the Railroad, there was a large cushion or pool of extra conductors. The earliest figures in the record indicate that in 1955, two years before the Railroad stopped promoting, the cushion between the average number of crews needed and the number of available conductors was 23. That cushion expanded to 49 in 1958 and then declined steadily (39 in 1960, 29 in 1964, 21 in 1967, 13 in 1970) down to 9 in 1972, when the Railroad was forced to add more conductors. The Railroad apparently had no problems as a result of having large pools of available conductors. It offers no reasons in this record, compelling or otherwise, besides "management prerogative," for keeping that pool as small as possible. Indeed there is uncontradicted testimony that until 1957, whites were routinely promoted to conductor after serving as a switchman for, on the average, less than one year. The Railroad makes much of the fact that whites were available for promotion between 1957 and 1971, though it nowhere asserts that this was the case before 1957. While we do not question that whites were available, we merely note that none of those whites serving as a switchman and not promoted between 1957 and 1972 remained with the company. None appears on the roster as of the trial date.

There is no question that the business of the railroad has declined. This might well justify a smaller cushion of extra conductors than was maintained during boom years. However, the burden of the depressed economic condition of the Railroad cannot be borne disproportionately by blacks. The remedial measure here in question, qualifying blacks as conductors, will cost the Railroad nothing and will more equitably distribute

the burden of bad times among all employees.

In addition to immediate promotion of competent blacks, the other aspect of "rightful place" is that "[w]hite incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority." Local 189 v. United States, *supra* at 988. Because all conductors hold (and have held since 1936) seniority as of their hire date, we do not have the usual kind of seniority problem in which blacks are at a competitive disadvantage upon promotion. *See* United States v. Jacksonville Terminal Co., *supra;* Local 189 v. United States, *supra.* The fact that promoted blacks will carry their company seniority with them, however, creates a "bumping" question.

Who has a "present" conductor position which is entitled to protection from bumping? This presents again the question of what is meant, in the context of this Railroad, by "vacancy." Logic and our prior decisions compel the conclusion that those incumbent whites working "regular" assignments should not be bumped. A true vacancy occurs when a regular conductor's job becomes available for bidding through death, retirement, promotion, or the like. Blacks must be allowed to qualify as conductors so that they can bid on these vacancies. Extra jobs are by definition temporary; persons working these jobs are not entitled to protection from bumping. Any extra conductor job must be open to all qualified conductors, black or white, on the usual bidding basis.

This protection from bumping incumbents is no more than the collective bargaining agreement already prescribes. Article 10(t)(1) provides, as has already been noted, that

> [c]onductors may give up a regular assignment and exercise their seniority by displacing a junior man on the extra board, *but will not be permitted to displace any man from a regular assignment.* (Emphasis added.)

In addition, the Railroad and the Union agreed on August 18, 1972, that

> once a switchman has qualified and acquires seniority as a conductor, . . . he will not be entitled to make an arbitrary first displacement or "roll" on a conductor position, but will be allowed to bid in a bulletined conductor assignment or exercise his conductor seniority in accordance with rules in the Yardman's Agreement.

This letter agreement did not represent a change in the collective bargaining agreement, but the problem did not arise before 1972 because all whites were promoted in order of their seniority. In 1972, however, for the first time, persons who had greater seniority than many already serving as conductors were promoted. The agreement letter clarified their situation with regard to existing conductor positions; they could not displace regular conductors. Therefore, although many of the black plaintiffs will move to the top of the seniority roster,[3] and all will be more senior than some currently holding conductor status, none will be allowed to bump whites in regular conductor assignments.

It is of course evident that when the blacks are allowed to qualify, they will be able to move into any regular job which becomes vacant due to death, illness, promotion, and the like, and will be able to take any biddable extra job to which their seniority entitles them. This will inevitably negatively affect some whites currently working as conductors. As we have noted elsewhere, the affirmative remedial relief required by the Act "often proves detrimental to whites' competitive seniority status, and consequently to their transfer and promotion expectations." United States v. Jacksonville Terminal Co., *supra* at 455. This regrettable detriment to the pool of extra white conductors is not to be equated with bumping whites from regular jobs.

Fashioning the appropriate remedy is a task for the district court. It has

---

3. It should be noted that most of the whites hired contemporaneously with the most senior blacks have moved into supervisory positions.

broad remedial powers to eliminate present effects of past discrimination. Local 189 v. United States, *supra;* United States v. Jacksonville Terminal Co., *supra.* We remand to the district court for the fashioning of such remedy, and state the following as a guide to the court in its further deliberation:

1. All black switchmen who would have been promoted but for their race, that is, anyone who is senior to any white conductor, must be allowed to take the test to qualify as conductors. Those who qualify are to be listed on the conductor's seniority roster according to their hire date.

2. All newly promoted conductors will be able to exercise their seniority in any biddable position. They will not be allowed to displace any person currently working a regular conductor assignment.

3. All persons hired after 1965, and from now on, will be promoted in order of seniority according to the needs of the Railroad as the collective bargaining agreement provides.

Having found against the switchmen, the district court awarded no back pay, or attorney's fees, and it awarded costs to defendants. We remand for a determination of these matters in light of this opinion, but make the following comments as a guide to the district court.

Congress has clearly authorized back pay awards under the Civil Rights Act, 42 U.S.C.A. § 2000e–5(g). This Court has held that the victims of employment discrimination must be compensated "if financial loss can be established," and that Title VII claims present an "appropriate area in which to require class-wide back-pay." Johnson v. Goodyear Tire & Rubber Co., *supra* at 1375. We have consistently held that back pay awards are necessary, not as punitive, but as remedial measures to compensate the victims of discrimination. *Id.* at 1376; *see also* United States v. Georgia Power Co., *supra* at 919–922; Pettway v. American Cast Iron Pipe Co., *supra* at 251–263; Rowe v. General Motors Corp., *supra* at 360.

The class of persons affected for purposes of back pay awards from 1965 to date should include those black switchmen who would have been promoted but for their race. The Act does not require a remedy for those not discriminated against. United States v. Chesapeake & Ohio Ry. Co., 4 Cir. 1972, 471 F.2d 582, 593. No one has here questioned that those employees hired since 1965 have been treated non-discriminatorily as to promotions. Therefore, those entitled to back pay are the black switchmen hired before 1965.

The Act also entitles successful private litigants to an award of attorney's fees as part of the costs in the discretion of the district court. 42 U.S.C.A. § 2000e–5(k). We have emphasized the importance of this encouragement of "private Attorneys General" in actions of this nature. Rowe v. General Motors, *supra* at 360 n. 26. *See* Newman v. Piggie Park Enterprises, Inc., 1968, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263. We have routinely awarded attorney fees in this kind of case. Duhon v. Goodyear Tire & Rubber Co., 5 Cir. 1974, 494 F.2d 817, 819–20; Morrow v. Crisler, 5 Cir. 1974, 491 F.2d 1053. For a full discussion of the guidelines this Court has laid down for arriving at the amount to be awarded, *see* Johnson v. Georgia Highway Express, Inc., 5 Cir. 1974, 488 F.2d 714.

IV. The Union's Liability

Because the district court found no Title VII violation, it did not consider the Union's liability. We therefore remand for further consideration of the extent of the Union's and the Local's participation in the perpetuation of the illegal system. *See* Johnson v. Goodyear Tire & Rubber Co., *supra* at 1381–82. The Union relies on the same basic arguments as the Railroad, and emphasizes particularly that promotion is a management prerogative, so as to further insulate the Union from liability. We have shown, however, that management prerogative cannot be exercised to extend a system which penalizes one race. The court should consider to what extent the Un-

ion's history of segregation[4] and its encouragement of and acquiescence in present practices through its collective bargaining agreement has contributed to the inferior position now held by blacks. Let it merely be reiterated that

[w]hen the current effects of past—and sometimes present—racial discrimination in entities subject to the National Labor Relations Act have come to our attention, this Court has unhesitatingly required affirmative remedial relief.

United States v. Jacksonville Terminal, *supra* at 455, and the cases cited therein.

## V. Variance between Charge to EEOC and Complaint

The switchmen at the Railroad complained in 1966 to the EEOC

in regard to the discrimination that exists because of race on this property. . . . The discrimination referred to in this complaint is chiefly the fact that negro switchmen are not allowed to promote to conductor because of race.

The EEOC investigated the charge and determined that there was reasonable cause to believe that the Railroad had violated Title VII. It found in its 1968 decision that

[r]easonable cause exists to believe that Respondent Employer is in violation of section 703(a)(1) of the Civil Rights Act of 1964, by denying promotional opportunity to negro switchmen, as alleged.

The district court found that the switchmen had complained only about not being allowed to promote to conductor, to participate in the extra board, or to join the union. The switchmen did not specify in their complaint that they were not allowed to promote to supervisor. The district court heard evidence on the question of supervisory promotions, but throughout the hearing declared it to be outside the permissible scope of the trial. The evidence showed that virtually all

supervisors were chosen from the conductor roster (the only ones not so chosen came from non-yard jobs, such as engineer). There was also evidence of the manner, largely the subjective decision of a few high-ranking officials, in which promotional decisions are made. No black had ever reached the supervisory level.

The Railroad urges here that the district court was correct in limiting the scope of the trial to the conductor question, because the original charge to the EEOC contemplated no more. The switchmen argue that the charge was broad enough to include all promotional opportunity denied them. The law in this Circuit regarding variance between charges and complaints is governed by Sanchez v. Standard Brands, Inc., 5 Cir. 1970, 431 F.2d 455, on which both parties rely. In that case, the complainant had originally charged sex discrimination, but the EEOC investigation revealed national origin discrimination. The complaint in federal court alleged the latter. This Court held that there was "sufficient continuity running through the original charge and the amended charge to the judicial pleadings which followed" to allow the complaint to stand. *Id.* at 465. We held that the allegations in the judicial complaint "may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission." *Id.* at 466, *citing* King v. Georgia Power Co., N.D.Ga.1968, 295 F.Supp. 943, 947.

We found in *Sanchez* that the purpose of the charge is to trigger the investigatory and conciliatory procedures of the EEOC. It was logical to limit the scope of the civil action to the scope of the EEOC investigation "which can reasonably be expected to grow out of the charge of discrimination." Sanchez v. Standard Brands, Inc., *supra* at 466. We further emphasized the importance of

---

4. The two classes of yardmen, conductors and switchmen, were represented by separate unions until 1967. The Brotherhood of Railroad Trainmen had a "white males only" clause in its charter until 1960.

the Commission's role in obtaining voluntary compliance. On the other hand, we also emphasized our reluctance to allow procedural technicalities to bar claims under the Act, *id.* at 461, 465, and that "the scope of an EEOC complaint should not be strictly interpreted." *Id.* at 465; *see also* Tipler v. E. I. duPont, 6 Cir. 1971, 443 F.2d 125, 131.

Sanchez does not completely answer the question posed in this case. The *Sanchez* court was faced with an EEOC investigation, and a complaint based thereon, which exceeded the scope of the original charge to the EEOC. Ours is a somewhat different situation, in that the complaint is said to exceed both the charge and the EEOC investigation. If charges are to be liberally construed, then the complaint that "I was not allowed to promote to conductor" implicitly includes the complaint that "I was not allowed to promote to supervisor," since supervisors are chosen from the ranks of conductor. *See* Tipler v. E. I. duPont, *supra* at 131; Burney v. North American Rockwell Corp., C.D.Calif.1969, 302 F.Supp. 86, 89. The supervisor complaint is certainly "like or related to" the conductor complaint and an investigation of the supervisor situation could reasonably be expected to grow from the original complaint. Nevertheless, the EEOC apparently did not in fact investigate beyond the conductor charge. This, says the Railroad, limits the permissible scope of the complaint in the federal court.

■ The Railroad further urges that it has a right to attempt conciliation on the supervisor question. As we have indicated, the statutory scheme contemplates conciliation. But we have clearly held that conciliation efforts by the EEOC are not a jurisdictional prerequisite to a Title VII suit.

> It is now too well settled to discuss that no EEOC effort to conciliate is required before a federal court may entertain a Title VII action.

Danner v. Phillips Petroleum Co., 5 Cir. 1971, 447 F.2d 159, 161; Miller v. International Paper Co., 5 Cir. 1969, 408 F.2d 283, 288–91; Dent v. St. Louis-San Francisco Ry. Co., 5 Cir. 1969, 406 F.2d 399. We have also held that a plaintiff may maintain a suit even when the EEOC has found no reasonable cause to believe discrimination has occurred.[5] Beverly v. Lone Star Lead Construction Corp., 5 Cir. 1971, 437 F.2d 1136. *See also* Johnson v. ITT-Thompson Industries, Inc., N.D.Miss.1971, 323 F.Supp. 1258. Therefore, although conciliation is encouraged, it is not an inalienable right of a defendant, especially where, as here, conciliation attempts with the defendant on a similar question failed.

Other policies besides conciliation should be considered. We and other courts have been solicitous of the Title VII plaintiff:

> We must ever be mindful that the provisions of Title VII were not designed for the sophisticated or the cognoscenti, but to protect equality of opportunity among all employees and prospective employees. This protection must

---

**5.** The Supreme Court has ratified this position:

> We agree with the Court of Appeals that absence of a Commission finding of reasonable cause cannot bar suit under an appropriate section of Title VII and that the District Judge erred in dismissing respondent's claim of racial discrimination under § 703(a)(1). Respondent satisfied the jurisdictional prerequisites to a federal action (i) by filing timely charges of employment discrimination with the Commission and (ii) by receiving and acting upon the Commission's statutory notice of the right to sue, 42 U.S.C.[A.] §§ 2000e–5(a) and 2000e–5(e). The Act does not restrict a complainant's right to sue to

those charges as to which the Commission has made findings of reasonable cause, and we will not engraft on the statute a requirement which may inhibit the review of claims of employment discrimination in the federal courts.

McDonnell Douglas Corp. v. Green, 1973, 411 U.S. 792, 798–99, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668; *see also* Robinson v. Lorillard Corp., 4 Cir. 1971, 444 F.2d 791, 800; Flowers v. Local 6, Laborers International Union of North America, 7 Cir. 1970, 431 F.2d 205; Fekete v. U. S. Steel Corp., 3 Cir. 1970, 424 F.2d 331.

be extended to even the most unlettered and unsophisticated.

Sanchez v. Standard Brands, *supra* at 463.

> [T]he Civil Rights Act is designed to protect those who are least able to protect themselves. Complainants to the EEOC are seldom [represented by] lawyers. To compel the charging party to specifically articulate in a charge filed with the Commission the full panoply of discrimination which he may have suffered may cause the very persons Title VII was designed to protect to lose that protection because they are ignorant of or unable to thoroughly describe the discriminatory practices to which they are subjected.

Willis v. Chicago Extruded Metals Co., N.D.Ill.1974, 375 F.Supp. 362, 365; Tipler v. E. I. duPont, *supra* at 131; Graniteville Co. v. Equal Employment Opportunity Commission, 4 Cir. 1971, 438 F.2d 32.

■ Another policy at work here is that of judicial economy. The lengthy process undergone by these litigants was recounted earlier. We see little to be gained by sending the plaintiffs back to the EEOC to begin anew with the supervisor claim.[6] We need not reiterate the remedial purpose of the statute. In light of that purpose and in the interest of judicial economy, we hold that the district court should have considered the switchmen's claim as to supervisory promotions. The question was "like or related to" the original charge before the EEOC. The discrimination alleged is of

the same type and character as that originally charged, and the same plaintiffs are involved. *See* Danner v. Phillips Co., *supra* at 162; Burney v. North American Rockwell Corp., *supra* at 89–90. If blacks cannot be promoted to conductor, then *a fortiori* they cannot be promoted to supervisor, and in fact have not been.

However, although evidence was heard on this question, the district court repeatedly declared its intention to ignore it because it believed the supervisor question was not properly part of the suit. The Railroad therefore presented no defense of its promotional policies. The supervisory positions are obviously different from those of conductor. There are a definite number of positions available, as opposed to the "pool" of conductors. There is no objective test given for supervisor, as there is for conductor. The decision to promote is a much more subjective one in that it is made by a very few representatives of management for admittedly subjective reasons, whereas conductors, except for race, are promoted in order of their seniority. Therefore, the guidelines here established for conductors are not adaptable to supervisors.

We remand this question for further consideration in light of this opinion. The district court should take into account any business necessity which the Railroad may offer and the standards used to determine who will be promoted.

Reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

---

6. To force an employee to return to the EEOC every time he claims a new instance of discrimination in order to have the EEOC and the courts consider the subsequent incident along with the original ones would erect a needless procedural barrier.

Willis v. Chicago Extruded Metals Co., *supra* at 365; *see also* Love v. Pullman Co., 1972, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679.