Emogene **KINARD**, Plaintiff,

v.

**NATIONAL SUPERMARKETS, INC. and Retail Clerks International Union, Local # 458, Defendants.**

Civ. A. No. 77–93–H.

United States District Court, S. D. Alabama, S. D.

Sept. 28, 1978.

Frankie Fields Smith, Mobile, Ala., for plaintiff.

Carroll H. Sullivan, Mobile, Ala., for Nat. Supermarkets, Inc.

George C. Longshore, Birmingham, Ala., for Retail Clerks Union.

HAND, District Judge.

This lawsuit was commenced by the filing of a complaint by the plaintiff seeking relief on various grounds from each of the defendants. While originally cast in the terms of a class action, the Court concluded that this lawsuit was not properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure and thus defendant National Supermarkets' [National] motion to strike the class allegations was granted on January 18, 1978, leaving the plaintiff to litigate only her individual claims.

In her first allegation against defendant National, Kinard, who is black, contends that this defendant engaged in a policy or practice that violated her equal employment opportunities, Title 42, U.S.C.A., § 2000e–5, since she was passed over for promotion in favor of a white female. The Court granted summary judgment on this issue in favor of the defendant through Findings of Fact and Conclusions of Law dated June 19, 1978, ruling that the fact that the plaintiff was unavailable for work at the time that the promotion was made estopped her from raising this claim. Thus, the Court did not reach the issue whether the failure to promote was racially motivated.

Kinard's second allegation in her complaint raises the contention that her hours were reduced as a result of her complaints concerning the allegedly improper promotion. Although the defendants filed for summary judgment on this issue also, the Court denied the motion and reserved its ruling pending the taking of evidence on the matter. The Court concluded that the uncontroverted evidence failed to establish the plaintiff's claims of reprisal under section 704(a) of the Civil Rights Act of 1964,

Title 42, U.S.C.A., § 2000e–3(a), but reserved its ruling to afford the plaintiff an opportunity to demonstrate whether her reduction in hours resulted from any racially discriminatory motivation.

Kinard's final allegations against National raise the contention that she has been subjected to harassment from the defendant and its agents as a result of her filing charges of discrimination with the EEOC. This allegation was not considered in the partial summary judgment.

The only issue raised by Kinard with respect to the defendant Retail Clerks' Union [Union] is that the Union failed and refused to adequately represent the plaintiff in her disputes with National concerning promotion and harassments. These issues were not considered on the motion for summary judgment.

The matter came on for trial before the Court on September 25, & 26, 1978, and the Court, having considered the record and the evidence adduced at trial, together with the applicable law, granted the motion of the defendant union for a directed verdict at the close of the plaintiff's evidence, and that of the defendant National at the close of all of the evidence, finding as follows:

## FINDINGS OF FACT

1. The plaintiff is a black resident citizen of Mobile, Alabama, and is presently employed by defendant National as a full-time cashier. At all times relevant to this lawsuit the plaintiff has been a member of defendant Retail Clerks Union, Local 458, AFL–CIO.

Defendant National is a corporation with its main offices in New Orleans, Louisiana. National operates six stores in the Mobile area and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, Title 42, U.S.C.A., §§ 2000e *et seq.* The defendant Retail Clerks Union is a labor organization within the meaning of the Act.

For purposes of clarity, the Court will deal with each of the plaintiff's claims separately.

### A. *Reprisal*

2. The plaintiff alleges that she was subjected to a reduction in her working hours as a result of complaining to the Union concerning the failure to promote her to full-time cashier before the promotion of a white female.

The facts surrounding the promotion question were made clear by the testimony. Kinard was on leave of absence, apparently due to illness, during August and most of September of 1973. At this time she was the senior-most part-time cashier at National Store # 73 and, according to the Union contract, was entitled to the next promotion to full-time cashier. During the period of Kinard's absence, management hired Lois West to train for the head cashier's position at Store # 73. West had fifteen years experience as a cashier with the Delchamps grocery chain, but was a new employee at National. During the training program for West at store # 73, she split her time between duties of a full-time cashier and duties of a head cashier, which are very different.

3. Kinard returned to work in late September of 1973 and saw that West had been made a full-time cashier, apparently bypassing her on the seniority list. Kinard then complained to the manager of store # 73, Jim Willis, who tried to explain that West had been hired as a head cashier trainee, not as a full-time cashier. This did nothing to assuage Kinard's feelings, and she carried her complaint to Cliff Taggard, the business representative for the defendant Union. Taggard was unaware of the situation, but promised to look into it for her.

4. Jimmy Fowler, National's District Supervisor, became aware of Kinard's complaints shortly after her return from leave of absence and, after a conversation with Taggard, both Taggard and Fowler agreed that it would be appropriate and equitable to give Kinard more working hours and to reduce West's so that they were approximately equal. As a result of this Kinard, who had been averaging between 20 and 30 hours per week prior to her leave of absence, worked 30 hours or more for each of

the eight weeks following her leave of absence. Fowler had instructed Willis to give Kinard 32 hours a week until West had completed her training for head cashier, and then to revert to the scheduling used prior to Kinard's leave of absence. As a result of this when West became a head cashier in later November of 1973, Kinard's hours were reduced and she began again to average 20 to 30 hours a week. At this time the plaintiff filed her first EEOC charge.

5. Approximately one month after the reduction in hours Vincent Viso, National's Personnel Director, reviewed the plaintiff's file and determined that since she had 30 or more hours a week for eight consecutive weeks from September 28, 1973 to November 21, 1973 she was, in accordance with the terms of the collective bargaining agreement, entitled to become a full-time cashier effective November 21, 1973. Viso communicated this conclusion to Fowler in a letter dated January 8, 1974 (Plaintiff's Exhibit 3), together with a voucher for $9.04 representing back pay lost through the company's error. A later review disclosed that the proper amount of back pay was $99.20 and Viso disclosed this to Fowler in a letter dated January 10, 1974 (Plaintiff's Exhibit 4). The balance of the back pay was tendered to Kinard but she refused to accept it, acting on the instructions of her attorney.

6. From the time of the letter of January 8, 1974 making her a full-time employee effective November 21, 1973, Kinard has been a full-time cashier at store # 73 to the present date.

B. *Representation by Union*

7. Kinard alleges that the defendant Union failed to effectively represent her in her disputes with National. The evidence does not support this at all. Kinard first complained to the Union representative Taggard about the allegedly improper promotion. Taggard met with Fowler and, while the promotion was not set aside, Kinard was given an increase in working hours that ultimately led to her achieving full-time status.

8. Two other occasions involving transactions between Kinard and the defendant Union came up in the form of complaints by Kinard over cashiers with less seniority than she being given earlier working hours, which she would prefer, and over the defendant calling in part-time cashiers to replace absent cashiers with working hours earlier than her own on days that she was also working (Union Exhibits E & K). The Union responded to her first complaint by noting that an employee senior to Kinard had been working even later than she, and that since the complaint did not involve a loss of hours or pay, the Union could not get involved. Testimony reflected that senior cashiers generally get the best working hours, but that the schedules are made on a weekly basis and that many occasions such as the plaintiff complained about will occur. On her second complaint the Union informed Kinard that the collective bargaining agreement did not require the store to accommodate her desires by changing its schedules when cashiers were sick, and that since there was no question of lost hours or pay the Union was not going to get involved.

9. The final complaint that Kinard made to the Union was in her letter of June 24, 1974 (Union Exhibit E), in which she reported that she had been informed by management that she was not entitled to a vacation of a week off with pay. She requested that the Union inform her of her rights on that point. Although there is no evidence that the Union responded to this plea, Kinard testified that she got her vacation that year after she wrote the letter, although not at the time she requested. Under the terms of Article XI of the collective bargaining agreement, however, Kinard was not entitled to a week's vacation prior to November 21, 1974, so her vacation in the summer of 1974 was evidently an act of goodwill on the part of the company.

C. *Harassment*

10. The predominance of the testimony put on by the plaintiff dealt with what she

alleges were acts of harassment by the company and its employees as a result of her filing EEOC charges against the company. Diligent and copious note-taking by the Court revealed the following alleged acts of harassment:

(a) forced her to run a money-counting machine that she did not know how to run;

(b) required her to clean all the registers in the store and then get down on her knees and scrub the floor;

(c) tried to get her to sign a letter stating that she had not been doing her work;

(d) accused her of being "stupid" and stating that she would be called a "liar" if she repeated the conversation;

(e) was told that she would be "clocked out and run out of the store;"

(f) was subjected to embarrassing chanting by other employees in the store;

(g) was treated differently than other cashiers in getting work breaks;

(h) has had grocery carts pushed at her by other cashiers;

(i) has been overworked during a peak period by the manager who let all other cashiers have a break and left Kinard as the only cashier to handle a large crowd;

(j) was told that the signing of the detail tape, although required of all employees, was "just for her;"

(k) was set up to be fired by someone turning off the detail tape in her machine so that her sales didn't appear;

(l) has been threatened with death by another employee who told her he had been paid to "bump her off;"

(m) has not received the proper amount in her till to start the day; and

(n) was required to work later hours than her less senior co-employees.

11. These harassment charges were the subject of Kinard's second EEOC charge. The EEOC's determination of August 22, 1975 (Plaintiff's Exhibit 29) states that its investigation did "not substantiate the allegations of continuing reprisal. The incidents appear to arise from problems of personal adjustment of charging party, and are therefore not within the jurisdiction of this Commission."

12. The harassment claims themselves came down to a swearing match at trial, with Kinard testifying to the circumstances surrounding each of the alleged acts of harassment, and the defendant putting on evidence through various witnesses to disclaim or explain each alleged act. The plaintiff called two witnesses to support her allegations concerning the detail tape, but the only witness called by the plaintiff to support other allegations was Larry Williams, who added some evidence to some of the claims but for the most part testified as to what he had heard. In view of the fact that Williams presently has a workman's compensation action pending against the defendant National in which Kinard is the only witness on a crucial notice question, and in view of Williams' deposition testimony that a head injury had impaired his memory to the extent that he must practice self-hypnosis to help him remember things, the Court does not find his testimony credible. With respect to Kinard's testimony, in view of the fact that her testimony on each alleged incident of harassment was contradicted by her employers or her co-employees, the Court finds her testimony also not to be believed. Most of the alleged acts of harassment occurred in open places in an allegedly open rather than subtle manner, so the Court finds it hard to give credence to the plaintiff's apparent theory that either no one observed these acts or that those observing such acts either refused to testify or were afraid to do so. On this basis, the Court finds that the plaintiff has not been subjected to any acts of harassment by virtue of her EEOC charges.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this lawsuit and the parties hereto by virtue of Title 42, U.S.C.A., § 2000e–5(f).

■ 2. Under Rule 50(a) of the Federal Rules of Civil Procedure a moving party is

entitled to a directed verdict in a non-jury case if the Court concludes that there is no evidence upon which the Court could find a verdict for the party against whom the motion is directed. Wright & Miller, *Federal Practice and Procedure*, § 2524, at 543 (1971). The Court, upon hearing the evidence in this case, concluded that there was no such evidence and directed a verdict in favor of the defendant Union at the close of the plaintiff's case, and in favor of the defendant National at the close of all of the evidence.

3. With respect to the plaintiff's claims against the Union, there clearly was no evidence of any violation of the Civil Rights Act of 1964. Under Title 42, U.S.C.A., § 2000e–2:

(c) It shall be an unlawful employment practice for a labor organization—

\* \* \* \* \* \*

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

A basic component of the prima facie case under this section is proof of racial discrimination, and there is no question but that lack of such proof is fatal to a case brought under this statute. *Cf. McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Gamble v. Birmingham Southern Railroad Company*, 514 F.2d 678 (5th Cir. 1975). In the present case the evidence is completely lacking of any inference that any action taken by the Union with respect to the plaintiff was racially motivated. The Court finds no evidence to support the plaintiff's allegation that the Union failed to represent her; however, even if such evidence was present it would still be necessary for the plaintiff to put on further proof that such failure to represent was racially motivated. The plaintiff's failure to convince the Court of either a failure to represent or of racial motivation is fatal, and the Court must find for the defendant Union.

4. On the question of reduction of hours the Court is convinced that the plaintiff has failed to state a claim under the purview of Title VII. The plaintiff contends that her hours were reduced as a result of her complaining to the Union about the promotion of Lois West. The evidence indicates that the reduction resulted from West becoming a head cashier and from the defendant's mistaken impression that Kinard was still a part-time employee, and the evidence further reveals that Kinard rejected the defendant's efforts to remedy its errors. Under section 2000e–3:

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter.

Since the Court has ruled previously that there was no unlawful employment practice involved in the promotion of Lois West, it is clear that Kinard's activities are not protected under this statute. Even assuming *arguendo* that her hours had been reduced as a result of her complaints to the Union, she would not be protected under the statute because the employment practice that she opposed was not unlawful. *See, EEOC v. C & D Sportswear Corporation*, 398 F.Supp. 300 (M.D.Ga.1975). Further, she cannot be heard to complain that the reduction in hours was a reprisal for the filing of charges since the evidence is clear that her hours were reduced prior to the date on which she filed charges with the EEOC. On this basis, the Court concludes that the defendant must prevail on the reprisal claims arising out of the reduction in hours.

■ 5. The harassment claims also amount to section 2000e–3 allegations of reprisal for filing EEOC charges. There is no question but that the filing of charge of discrimination with the EEOC is a protected activity and that employers must be prevented from interfering with such activity through the use of economic or emotional sanctions. *East v. Romine, Inc.*, 518 F.2d 332 (5th Cir. 1975); *Pettway v. American Cast Iron Pipe Company*, 411 F.2d 998 (5th Cir. 1969).

■ The question for the Court on this issue is whether the plaintiff was discriminated against as a result of her protected activity. Although the plaintiff testified to many incidents of alleged harassment, the Court concludes that such testimony was for the most part not credible and, where credible, was effectively rebutted or explained by other witnesses. Lacking any evidence of acts of harassment, the Court finds for the defendants on these claims.