807 F.2d 1550
 42 Fair Empl.Prac.Cas. 1289,
42 Empl. Prac. Dec. P 36,769
Sondra TAMIMI, Plaintiff-Appellee, Cross-Appellant,
v.
HOWARD JOHNSON COMPANY, INC. a Maryland Corporation,
Defendant-Appellant, Cross-Appellee.
 No. 85-7300.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 20, 1987.
 
 Brock B. Gordon, Johnstone, Adams, May, Howard & Hill, Celia J. Collins, Mobile, Ala., for defendant-appellant, cross-appellee.
 Gary E. Atchison, Shinbaum & Atchison, Montgomery, Ala., for plaintiff-appellee, cross-appellant.
 Appeals from the United States District Court for the Middle District of Alabama.
 Before RONEY, Chief Judge, CLARK, Circuit Judge, and DOYLE*, Senior District Judge.
 CLARK, Circuit Judge:
 
 
 1
 The central question presented by this case is whether the district court's findings in favor of the plaintiff, Sondra Tamimi, on a charge of sex discrimination are clearly erroneous.[1]
 
 
 2
 Sondra Tamimi was employed as a desk clerk at a Howard Johnson Motor Lodge in Montgomery, Alabama on two separate occasions. She was first employed there in June, 1981, working there for only a short time before quitting because of difficulty in arranging transportation to her job. She was hired by Howard Johnson a second time in October, 1981. On both occasions, she was hired by the manager of the motor lodge, Albert Gallof. Gallof's testimony indicates that on both occasions when he hired Tamimi she was wearing no makeup and had a fair complexion. At the inception of her employment each time, Tamimi was informed that she would be required to report to work in a standard Howard Johnson uniform for women; however, on neither occasion did Gallof inform her that she had to wear makeup and lipstick while she was working behind the front desk. See Record, Vol. II, at 125, 133-34. In fact, Howard Johnson has no company policy requiring women to wear makeup or lipstick. See id. at 16-17. The testimony is uncontroverted that Tamimi did not wear cosmetics of any kind at any time during her employment by Howard Johnson.
 
 
 3
 Gallof testified that he had no complaints about Tamimi's performance on the job prior to June 15, 1982. Id. at 28. On that date, Gallof brought up the matter of Tamimi's use of the company phone for personal long distance telephone calls. Some months earlier, Tamimi had apparently asked Gallof if she could use the office phone to make some long distance calls to clear up an immigration problem concerning her husband. She had no telephone in her home at that time. Gallof seems to have given her permission, and she proceeded to make such calls over a period of months. On June 15, Gallof noticed some charges for calls on the latest office telephone bill which he did not recognize. He asked Tamimi about them, and she explained that they were calls she had made about her husband's immigration matter. She further informed him that there were similar charges on earlier bills. Gallof proceeded to add up all of these charges and presented the total to Tamimi. She paid the total with a check to Howard Johnson. Gallof then apparently wrote a note to himself for the file which stated: "Employee warned for improper use of company funds (telephone calls)." Plaintiff's Exhibit 12. The matter does not appear to have been mentioned again. See Record, Vol. II, at 26-28, 32, 98-104, 135-39.
 
 
 4
 At a meeting of the office staff of the motor lodge on June 17, 1982, Gallof announced that he was installing a new dress code effective immediately. This dress code was not based upon an order from corporate headquarters but sprang solely from the mind of Gallof. See id. at 16-17. The new dress code required, among other things, that all women wear makeup and lipstick. See Plaintiff's Exhibit 9. Since Tamimi was the only woman then employed at the motor lodge who did not already wear makeup, and since she had already told Gallof on several occasions that she would not wear it, it seems that the new makeup requirement was directed specifically at her.
 
 
 5
 Tamimi claims that when she was informed of this new policy requiring the wearing of makeup at the meeting, she exclaimed, "Oh, no, my mother is going to die, because this is against my religion." Record, Vol. II, at 107. At trial, both Gallof and Tina Peoples, another member of the office staff who was also at the meeting, testified that they did not hear Tamimi make such a statement. Id. at 166, 171.
 
 
 6
 Gallof claims that he instituted this new dress code because Tamimi had been coming to work looking pale, with her face broken out, and occasionally with unbrushed hair. Tamimi claims that she had no problems with her complexion related to her pregnancy. Id. at 143-44. The beginning of this period when Gallof claims that he began to notice that Tamimi looked pale and that her face was breaking out apparently coincides with Tamimi's having become pregnant. Tamimi learned that she was pregnant and so informed Gallof in mid-June. Prior to that time, he had never complained about her appearance or complexion. See id. at 125.
 
 
 7
 Following the promulgation of this new dress code, Tamimi still refused to wear makeup and lipstick. Gallof asserts that on Friday, June 25, 1982, he orally warned Tamimi that her personal appearance was not satisfactory. Id. at 35. Gallof, who had met Tamimi's sister and noticed that she wore makeup, also claims that he asked Tamimi at this time why she, unlike her sister, would not wear makeup. He states that Tamimi's response was, "Well, I am not my sister." Id. at 172. Tamimi states that she had no such discussion with Gallof on the 25th concerning makeup and lipstick. Id. at 145.
 
 
 8
 Gallof and Tamimi agree that on June 25, 1982, Gallof issued a written reprimand to Tamimi for not delivering a phone message to him. See id. at 33, 104; Plaintiff's Exhibit 13. After this warning on the 25th, Tamimi called the EEOC to inquire whether it was against the law to fire someone for not wearing makeup.
 
 
 9
 Gallof testified that when he came to work on Monday, June 28, 1982, he noticed that Tamimi's appearance had not improved. He further testified that he approached Tamimi that afternoon and asked her if she were ever going to improve her appearance and that she responded that she would not. Tamimi denies that she was asked such a question that afternoon; however, she states that she knew that she would be fired that day because she continued to refuse to wear makeup and had been warned the previous week. Both parties agree that Tamimi was then informed by Gallof that she should go home without finishing her shift and was further told, "There's no sense in coming back then." Record, Vol. II, at 52. Gallof's testimony concerning this exchange and the subsequent dismissal of Tamimi was as follows:
 
 
 10
 A. I had asked Mrs. Tamimi if she would ever improve upon her personal appearance. This was after that we had a written reprimand. And at that time she said no. And I said, "There's no sense in coming back then."
 
 
 11
 Q. All right. Now when you asked her if she would improve, did you specify that you meant by improving, i.e., to wear makeup?
 
 
 12
 A. I told her if she would wear makeup and lipstick or anything--you know, it didn't have to be makeup or lipstick, the only thing I was concerned with was personal appearance. If she could have improved her personal appearance without makeup and without lipstick, that would have been fine with me. And I made that perfectly clear to her. I don't personally see how she could have done it, but if she could have improved her appearance by lying in the sun or going and using some something to improve her appearance--she had looked okay until that two or three week period before that, you know, she didn't have any makeup then and she did a very nice job and she looked fine for us, but for a two or three week period up until that point, her appearance had continued to slide down. And if she could have done something to bring it up without makeup, that would have been fine with me.
 
 
 13
 Q. Didn't that period of time correspond with the period of time when she found out she was pregnant, she had told you about her pregnancy?
 
 
 14
 A. There's lots of pregnant women who can still stay attractive.
 
 
 15
 Q. We are talking about Mrs. Tamimi. Didn't that two or three week period of time correspond with the period of time when she found out she was pregnant and so informed you of her pregnancy?
 
 
 16
 A. Yes, she informed me of her pregnancy.
 
 
 17
 Q. And wasn't it about that two or three week period of time?
 
 
 18
 A. I think it was.
 
 
 19
 Q. Right at the start of that time?
 
 
 20
 A. Yes.
 
 
 21
 Q. And you started then observing some problems with her appearance. What problems were there?
 
 
 22
 A. Well her major ones were that her face was very, very pale all the time. Does that relate to something?
 
 
 23
 Q. Her face.
 
 
 24
 A. Right. Her complexion was getting more and more broken out.
 
 
 25
 Q. Where?
 
 
 26
 A. Complexion, face. And that's probably the main part right there.
 
 
 27
 Q. Really weren't you concerned about her having a broken out face that was resulting from her pregnancy?A. Hey, I was concerned about her personal appearance. It is very important to me on what their appearances are towards the guests.
 
 
 28
 Q. Weren't you concerned about a pregnant woman manning that desk?
 
 
 29
 A. Absolutely not, I love to have pregnant women up there. Howard Johnson's has always been geared towards the family image, if we have a pregnant woman on the desk she can be as attractive or more attractive as when they are not pregnant, and it would have been fine with me.
 
 
 30
 Q. Except when their face breaks out, right?
 
 
 31
 A. Most women can take care of themselves.
 
 
 32
 Q. Wasn't it indeed true that you wanted to terminate Mrs. Tamimi--
 
 
 33
 A. Absolutely not.
 
 
 34
 Q. --because one, she was pregnant, and then when you told her to wear makeup she refused and told you that she was a person of religious belief that did not allow wearing makeup?
 
 
 35
 A. That's absolutely incorrect. In fact on that last day when Mrs. Tamimi was terminated, on that day I specifically, I said, "Are you going to do something to improve your appearance? I am not concerned with what it is, again, you can do whatever you want." I was even willing and had planned, you know, to try her another day; if she had improved her appearance I am sure she would still be working for us today. These problems are by themselves minor, accumulatively they are very large. And her personal appearance had continued to slide down until they reached the point where I couldn't have her at the front desk like that. Again, if she could have improved her appearance without makeup and without lipstick, that would have been fine with me. I was very concerned about personal appearance.
 
 
 36
 Id. at 52-55.
 
 
 37
 Gallof proceeded to write out an employee reprimand stating that Tamimi's offense was "failure to meet [the] Company dress code" after her first warning at the staff meeting on June 17 and her second warning on June 25. See Plaintiff's Exhibit 14. When she was handed the reprimand and had read it through, Tamimi handed it back to Gallof and requested that he write down the way in which she had violated the dress code. Gallof then wrote at the bottom of the reprimand "Employee failed to put make-up [sic] and lipstick on." Id.; Record, Vol. II, at 35-36, 148.
 
 
 38
 That same day, June 28, Gallof wrote two notes to himself. The first, written the morning before Tamimi was dismissed, stated, "Employee came in (A) looking like still asleep (B) hair not brushed (C) face extremely broken out." Record, Vol. II, at 38-39; Plaintiff's Exhibit 15. The second, written after Tamimi's dismissal, said, "Told her that work performance was no longer up to company standard. Personal problems affecting work quality. 1. Often came in looking just woke up [sic] + no make-up [sic]. 2. Front desk not properly run: A. messages not received B. Folios not filled out correctly C. Guest complaints concerning blase attitude." Record, Vol. II, at 39-40; Plaintiff's Exhibit 15. Tamimi testified that Gallof had never told her that guests had complained about her or that she had not filled out folios correctly. Record, Vol. II, at 124-25. In the formal Personnel Action Form for Tamimi's dismissal, which he signed on July 2, 1982, Gallof wrote: "Dismissed for: 1) unauthorized use of telephone[,] 2) failure to comply with Co. Dress Code[,] 3) work performance consistently not up to standards." Plaintiff's Exhibit 8; Record, Vol. II, at 14.
 
 
 39
 With regard to Tamimi's claim of sex discrimination, the district court found as follows:
 
 
 40
 In regard to plaintiff's claim of sex-based discrimination, the Court concludes that plaintiff has established a prima facie case of disparate treatment by demonstrating that she was discharged "under circumstances which give rise to an inference of unlawful discrimination." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 [101 S.Ct. 1089, 1094, 67 L.Ed.2d 207] (1981), citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973). As noted above, the evidence established that plaintiff was dismissed for failing to comply with the rule implemented by the manager of the motor lodge that all female employees wear makeup. After plaintiff had proved her prima facie case, defendant failed to show a legitimate, nondiscriminatory reason for plaintiff's rejection. Id. [45 U.S.] at 253 [101 S.Ct. at 1093]. The Court is convinced that other reasons listed by defendant as reasons for the termination, such as allegations that plaintiff had a "blase attitude" and did not deliver messages to the manager, were a pretext for the real reason for plaintiff's discharge which was plaintiff's refusal to wear makeup after she became pregnant and her appearance deteriorated.
 
 
 41
 Defendant has not demonstrated that requiring that female employees wear makeup is necessary to maintain the defendant's public image, which would have established a "bona fide occupation qualification reasonably necessary to the normal operation of that particular business or enterprise ..." 42 U.S.C. Sec. 2000e-2(e). As noted by the Supreme Court in Dothard v. Rawlinson, 433 U.S. 321 [97 S.Ct. 2720, 53 L.Ed.2d 786] (1977), the bona fide occupation qualification exception should be interpreted narrowly. It is particularly significant that the requirement about makeup was not a policy of defendant generally and became a policy of Mr. Gallof only after plaintiff became pregnant and her appearance deteriorated.
 
 
 42
 In deciding that plaintiff was a victim of sex discrimination, the Court need not decide whether an employer under certain circumstances may require its female employees to wear makeup. The particular facts of this case, however, suggest that it is important to look behind defendant's facially neutral rule to see that the rule was implemented with plaintiff in mind. Although other women worked as desk clerks for defendant, she was the only member of the staff who did not wear makeup. Plaintiff's appearance had not caused problems with her manager in the past. Plaintiff's supervisor admitted that "up until that time, the middle of June, she looked fine and there was no need for her to wear makeup." (Gallof dep. at p. 44) It was only when plaintiff became pregnant which caused her face to "break out," that Gallof implemented the rule which he knew plaintiff would not obey.
 
 
 43
 Based on Mr. Gallof's testimony, there is no doubt that if plaintiff had not become pregnant, she would not have been dismissed from her job. To require that plaintiff wear makeup because she appears less attactive [sic] when pregnant, even though the employer had no such requirement of plaintiff or any other employee prior to plaintiff's pregnancy, is a form of sexual discrimination. Pregnancy is a "fundamental sexual characteristic" that is a protected characteristic under Title VII. Garcia v. Gloor, 618 F.2d 264, 269 (5th Cir.1980), cert. denied, 449 U.S. 1113 [101 S.Ct. 923, 66 L.Ed.2d 842] (1981); Willingham v. Macon Telegraph Publishing Co., 507 F.2d 1084 (5th Cir.1975) (en banc). Accordingly, the Court finds that the mandatory makeup rule was conceived, implemented and applied to plaintiff in a discriminatory manner because of plaintiff's pregnancy, and further finds that, in dismissing plaintiff from her job, defendant discriminated against plaintiff on the basis of her sex.
 
 
 44
 Record, Vol. I, at 118-21.
 
 
 45
 We have stated the evidence and the district court opinion in detail. This is an unusual case which does not fit into the usual pattern of a sex discrimination case. However, we agree with the district judge's decision and his reasoning. We find that the evidence supports the findings of the district court and that none of the findings are clearly erroneous.
 
 
 46
 Before proceeding to a discussion of the discrimination issue, it is first necessary to consider appellant's first two issues presented in its brief. In its first contention appellant argues that the trial court erred in entering judgment on an issue not properly in the case by pleadings or amendment, contrary to Fed.R.Civ.P. 15 and our holding in Cioffe v. Morris, 676 F.2d 539 (11th Cir.1982).
 
 
 47
 As a corollary to its first issue, appellant contends that the trial court erred in its finding that plaintiff's claim of sex-based discrimination was "like or related to" plaintiff's religious discrimination charge which was before the EEOC. In the note[2] we reproduce in full the district court's order of February 7, 1985, which was entered after the evidence had been submitted in this non-jury bench trial. Although the plaintiff submitted further evidence in the form of a deposition which had been taken, the appellant did not avail itself of the opportunity to present additional evidence on the issue of sex discrimination. The appellant/defendant submitted a supplemental trial brief in which it discussed the law concerning sex discrimination as it pertains to dress codes, but made no reference to any desire to offer further evidence on the subject and registered no complaint that the court was incorrect in its interpretation of the breadth of the discrimination charge before the EEOC. Appellant has waived its right to complain about these matters which were not addressed by it to the district court before judgment after being given the opportunity to do so.
 
 
 48
 The third and fourth arguments advanced by appellant are founded upon its view that the district court was clearly erroneous in its findings of fact. While we might have reached a different result if we had heard the witnesses, that is not the way the system works. As the Court discussed in Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), discriminatory intent is the basis of a Title VII action, and discriminatory intent is a fact, the finding of which is within the purview of Fed.R.Civ.P. 52(a).
 
 
 49
 We have lengthened this opinion by reciting much of the testimony and the pertinent parts of the district court order. The district court found that the dress code was implemented for pretextual purposes and directed at plaintiff. This seems very clear. Gallof became perturbed June 15, adopted the dress code June 17, warned the plaintiff that day and discharged her June 28 when she failed to use makeup. His complaint was that her face was "very, very pale" and her complexion was broken out. Gallof's discontent about the plaintiff's looks commenced the day plaintiff told him she was pregnant. The district court concluded that plaintiff established a prima facie case of sexual discrimination and that the employer did not prove any legitimate reasons for discharging the plaintiff. The case of Willingham v. Macon Telegraph Publishing Co., 507 F.2d 1084 (5th Cir.1975), does not control this case. That was a hiring case. Here the dress code was adopted to furnish a basis for discharging the plaintiff. Gallof knew the plaintiff would not wear makeup and chose that course of action as a means of effecting the discharge.
 
 
 50
 This is one of those gray cases which reach this court and could have been decided either way at the trial level. The experienced trial judge saw the witnesses and evaluated their testimony and sincerity and concluded that this discharge was more than likely based upon sex discrimination. We leave it at that.
 
 
 51
 AFFIRMED.
 
 
 
 *
 Honorable James E. Doyle, Senior U.S. District Judge for the Western District of Wisconsin, sitting by designation
 
 
 [1]
 On cross-appeal, Tamimi challenges the district court's finding that she failed to make out a case of religious discrimination because she had not communicated to her employer that the reason she refused to wear makeup was her religious beliefs. Having reviewed the testimony presented to the district court, we cannot conclude that its finding on this point was clearly erroneous
 
 
 [2]
 In the absence of a transcript of the proceedings in this case, the Court cannot be sure of exactly what rulings the Court may have made at trial in regard to plaintiff's contention that her complaint before the Equal Employment Opportunity Commission was broad enough to encompass a claim of sex discrimination. The Court is under the impression that only the claims of religious discrimination were discussed. Plaintiff's complaint, however, also included an allegation of sex-based discrimination
 Upon an examination of such cases as Danner v. Phillips Petroleum Co., 447 F.2d 159 (5th Cir.1971); Gamble v. Birmingham So. R.R. Co., 514 F.2d 678 (5th Cir.1975); and Hicks v. ABT Associates, 572 F.2d 960 (3d Cir.1977 [1978], the Court is of the opinion that "a reasonable inquiry [by the EEOC] would have reached" the sex discrimination claim. 572 F.2d at 967. Accordingly, the Court is of the opinion that both religious discrimination and sex discrimination claims are properly before the Court.
 The Court believes that the evidence already presented by both plaintiff and defendant adequately addressed the issue of sex discrimination. If either party desires, however, to have the case reopened in order to present additional evidence on this issue, the party should communicate this intention to the Court within seven days and the case will be reopened to allow such testimony.
 Record, Vol. I, pp. 79-80.